COMMITTEE FOR PUBLIC EDUCATION AND RELI-
GIOUS LIBERTY ET AL. *v.* REGAN, COMPTROLLER
OF NEW YORK, ET AL.

No. 78–1369.   Argued November 27, 1979—Decided February 20, 1980

648

Wʜɪᴛᴇ, J., delivered the opinion of the Court, in which Bᴜʀɢᴇʀ, C. J., and Sᴛᴇᴡᴀʀᴛ, Pᴏᴡᴇʟʟ, and Rᴇʜɴǫᴜɪsᴛ, JJ., joined. Bʟᴀᴄᴋᴍᴜɴ, J., filed a dissenting opinion, in which Bʀᴇɴɴᴀɴ and Mᴀʀsʜᴀʟʟ, JJ., joined, post, p. 662. Sᴛᴇᴠᴇɴs, J., filed a dissenting opinion, post, p. 671.

*Leo Pfeffer* argued the cause and filed a brief for appellants.

*Shirley Adelson Siegel,* Solicitor General of New York, argued the cause for appellees Regan et al. With her on the brief were *Robert Abrams,* Attorney General, and *John Q. Driscoll,* Assistant Attorney General. *Richard E. Nolan* argued the cause for appellee schools. With him on the brief was *Thomas J. Aquilino, Jr. Nathan Lewin* and *Dennis Rapps* filed a brief for appellee Yeshivah Rambam.

Mʀ. Jᴜsᴛɪᴄᴇ Wʜɪᴛᴇ delivered the opinion of the Court.

The issue in this case is the constitutionality under the First and Fourteenth Amendments of the United States Constitution of a New York statute authorizing the use of public funds to reimburse church-sponsored and secular nonpublic schools for performing various testing and reporting services mandated by state law. The District Court sustained the statute. *Committee for Public Education* v. *Levitt,* 461 F. Supp. 1123 (1978). We noted probable jurisdiction, 442 U. S. 928 (1979), and now affirm the District Court's judgment.

I

In 1970, the New York Legislature appropriated public funds to reimburse both church-sponsored and secular nonpublic schools for performing various services mandated by the State. The most expensive of these services was the "administration, grading and the compiling and reporting of the results of tests and examinations." 1970 N. Y. Laws, ch. 138, § 2. Covered tests included both state-prepared examinations and the more common and traditional teacher-prepared tests. Although the legislature stipulated that "[n]othing contained in this act shall be construed to authorize the making of any payment under this act for religious

worship or instruction," § 8, the statute did not provide for any state audit of school financial records that would ensure that public funds were used only for secular purposes.

In *Levitt* v. *Committee for Public Education*, 413 U. S. 472 (1973) (*Levitt I*), the Court struck down this enactment as violative of the Establishment Clause.[1] The majority focused its concern on the statute's reimbursement of funds spent by schools on traditional teacher-prepared tests. The Court was troubled that, "despite the obviously integral role of such testing in the total teaching process, no attempt is made under the statute, and no means are available, to assure that internally prepared tests are free of religious instruction." *Id.*, at 480. It was not assumed that nonpublic school teachers would attempt in bad faith to evade constitutional requirements. Rather, the Court simply observed that "the potential for conflict 'inheres in the situation,' and because of that the State is constitutionally compelled to assure that the state-supported activity is not being used for religious indoctrination." *Ibid.*, quoting *Lemon* v. *Kurtzman*, 403 U. S. 602, 617 (1971). Because the State failed to provide the required assurance, the challenged statute was deemed to constitute an impermissible aid to religion.

The Court distinguished its earlier holdings in *Everson* v. *Board of Education*, 330 U. S. 1 (1947), and *Board of Education* v. *Allen*, 392 U. S. 236 (1968), on grounds that the state aid upheld in those cases, in the form of bus rides and loaned secular textbooks for sectarian schoolchildren, was "of a substantially different character" from that presented in *Levitt I*. *Levitt I, supra,* at 481. Teacher-prepared tests were deemed by the Court to be an integral part of the teaching process. But obviously so are textbooks an integral part of the teaching

---

[1] The First Amendment provides that "Congress shall make no law respecting an establishment of religion. . . ." This Court has repeatedly held the Establishment Clause applicable to the States through the Fourteenth Amendment. *E. g., Meek* v. *Pittenger,* 421 U. S. 349, 351 (1975); *Cantwell* v. *Connecticut,* 310 U. S. 296, 303 (1940).

process. The crucial feature that distinguished tests, according to the Court, was that, " '[i]n terms of potential for involving some aspect of faith or morals in secular subjects, a textbook's content is ascertainable, but a teacher's handling of a subject is not.' " 413 U. S., at 481, quoting *Lemon* v. *Kurtzman, supra,* at 617. Thus, the inherent teacher discretion in devising, presenting, and grading traditional tests, together with the failure of the legislature to provide for a method of auditing to ensure that public funds would be spent exclusively on secular services, disabled the enactment from withstanding constitutional scrutiny.[2]

Almost immediately the New York Legislature attempted to eliminate these defects from its statutory scheme. A new statute was enacted in 1974,[3] and it directed New York's Com-

---

[2] The majority in *Levitt I* concluded:

"We hold that the lump-sum payments under Chapter 138 violate the Establishment Clause. Since Chapter 138 provides only for a single per-pupil allotment for a variety of specified services, some secular and some potentially religious, neither this Court nor the District Court can properly reduce that allotment to an amount corresponding to the actual costs incurred in performing reimbursable secular services. That is a legislative, not a judicial, function." 413 U. S., at 482.

[3] Chapter 507, 1974 N. Y. Laws, as amended by ch. 508, note following N. Y. Educ. Law § 3601 (McKinney Supp. 1971–1979), provides in relevant part:

"Section 1. Legislative findings. The legislature hereby finds and declares that:

"The state has the responsibility to provide educational opportunity of a quality which will prepare its citizens for the challenges of American life in the last decades of the twentieth century.

"To fulfill this responsibility, the state has the duty and authority to evaluate, through a system of uniform state testing and reporting procedures, the quality and effectiveness of instruction to assure that those who are attending instruction, as required by law, are being adequately educated within their individual capabilities.

"In public schools these fundamental objectives are accomplished in part through state financial assistance to local school districts.

"More than seven hundred thousand pupils in the state comply with the compulsory education law by attending nonpublic schools. It is a

missioner of Education to apportion and to pay to nonpublic schools the actual costs incurred as a result of compliance with certain state-mandated requirements, including

"the requirements of the state's pupil evaluation program,

matter of state duty and concern that such nonpublic schools be reimbursed for the actual costs which they incur in providing services to the state which they are required by law to render in connection with the state's responsibility for reporting, testing and evaluating.

.        .        .        .        .

"§ 3. Apportionment. The commissioner shall annually apportion to each qualifying school, for school years beginning on and after July first, nineteen hundred seventy-four, an amount equal to the actual cost incurred by each such school during the preceding school year for providing services required by law to be rendered to the state in compliance with the requirements of the state's pupil evaluation program, the basic educational data system, regents examinations, the statewide evaluation plan, the uniform procedure for pupil attendance reporting, and other similar state prepared examinations and reporting procedures.

.        .        .        .        .

"§ 7. Audit. No application for financial assistance under this act shall be approved except upon audit of vouchers, or other documents by the commissioner as are necessary to insure that such payment is lawful and proper.

"The state department of audit and control shall from time to time examine any and all necessary accounts and records of a qualifying school to which an apportionment has been made pursuant to this act for the. purpose of determining the cost to such school of rendering the services referred to in section three of this act. If after such audit it is determined that any qualifying school has received funds in excess of the actual cost of providing the services enumerated in section three of this act, such school shall immediately reimburse the state in such excess amount.

.        .        .        .        .

"§ 9. In enacting this chapter it is the intention of the legislature that if section seven or any other provision of this act or any rules or regulations promulgated thereunder shall be held by any court to be invalid in whole or in part or inapplicable to any person or situation, all remaining provisions or parts thereof or remaining rules and regulations or parts thereof not so invalidated shall nevertheless remain fully effective as if the invalidated portion had not been enacted or promulgated, and

the basic educational data system, regents examinations, the statewide evaluation plan, the uniform procedure for pupil attendance reporting, and other similar state prepared examinations and reporting procedures." 1974 N. Y. Laws, ch. 507, § 3.

Of signal interest and importance in light of *Levitt I,* the new scheme does not reimburse nonpublic schools for the preparation, administration, or grading of teacher-prepared tests. Further, the 1974 statute, unlike the 1970 version struck down in *Levitt I,* provides a means by which payments of state funds are audited, thus ensuring that only the actual costs incurred in providing the covered secular services are reimbursed out of state funds. § 7.

Although the new statutory scheme was tailored to comport with the reasoning in *Levitt I,* the District Court invalidated the enactment with respect to both the tests and the reporting procedure. *Committee for Public Education* v. *Levitt,* 414 F. Supp. 1174 (1976) (*Levitt II*). The District Court understood the decision in *Meek* v. *Pittenger,* 421 U. S. 349 (1975), to require this result. In *Meek,* decided after *Levitt I,* this Court held unconstitutional two Pennsylvania statutes insofar as they provided auxiliary services and instructional material and equipment apart from textbooks to nonpublic schools in the State, most of which were sectarian. The Court ruled that in "religion-pervasive" institutions, secular and religious education are so "inextricably intertwined" that "[s]ubstantial aid to the education function of such schools . . . necessarily results in aid to the sectarian school enterprise as a whole" and hence amounts to a forbidden establishment of religion. 421 U. S., at 366.

*Levitt II* was appealed to this Court. We vacated the District Court's judgment and remanded the case in light of our decision in *Wolman* v. *Walter,* 433 U. S. 229 (1977). On

---

the application of any such invalidated portion to other persons not similarly situated or other situations shall not be affected thereby."

remand the District Court ruled that under *Wolman* "state aid may be extended to [a sectarian] school's educational activities if it can be shown with a high degree of certainty that the aid will only have secular value of legitimate interest to the State and does not present any appreciable risk of being used to aid transmission of religious views." 461 F. Supp., at 1127. Applying this "more flexible concept," *ibid.*, the District Court concluded that New York's statutory scheme of reimbursement did not violate the Establishment Clause.

Our jurisdiction to review the District Court's judgment lies under 28 U. S. C. § 1253.

## II

Under the precedents of this Court a legislative enactment does not contravene the Establishment Clause if it has a secular legislative purpose, if its principal or primary effect neither advances nor inhibits religion, and if it does not foster an excessive government entanglement with religion. See *Roemer* v. *Maryland Public Works Bd.*, 426 U. S. 736, 748 (1976); *Committee for Public Education* v. *Nyquist*, 413 U. S. 756, 772–773 (1973); *Lemon* v. *Kurtzman*, 403 U. S., at 612–613.

In *Wolman* v. *Walter, supra,* this Court reviewed and sustained in relevant part an Ohio statutory scheme that authorized, *inter alia,* the expenditure of state funds

"[t]o supply for use by pupils attending nonpublic schools within the district such standardized tests and scoring services as are in use in the public schools of the state." Ohio Rev. Code Ann. § 3317.06 (J) (Supp. 1976).

We held that this provision, which was aimed at providing the young with an adequate secular education, reflected a secular state purpose. As the opinion of MR. JUSTICE BLACKMUN stated, "[t]he State may require that schools that are utilized to fulfill the State's compulsory-education requirement meet certain standards of instruction, . . . and may examine both

teachers and pupils to ensure that the State's legitimate interest is being fulfilled." *Wolman* v. *Walter, supra,* at 240. See *Levitt I,* 413 U. S., at 479–480, n. 7; *Lemon* v. *Kurtzman, supra,* at 614. MR. JUSTICE BLACKMUN further explained that under the Ohio provision the nonpublic school did not control the content of the test or its result. This "serves to prevent the use of the test as a part of religious teaching, and thus avoids that kind of direct aid to religion found present in *Levitt [I]*." *Wolman* v. *Walter,* 433 U. S., at 240. The provision of testing services hence did not have the primary effect of aiding religion. *Ibid.* It was also decided that "the inability of the school to control the test eliminates the need for the supervision that gives rise to excessive entanglement." *Id.,* at 240–241. We thus concluded that the Ohio statute, insofar as it concerned examinations, passed our Establishment Clause tests.

## III

We agree with the District Court that *Wolman* v. *Walter* controls this case. Although the Ohio statute under review in *Wolman* and the New York statute before us here are not identical, the differences are not of constitutional dimension. Addressing first the testing provisions, we note that here, as in *Wolman,* there is clearly a secular purpose behind the legislative enactment: "[T]o provide educational opportunity of a quality which will prepare [New York] citizens for the challenges of American life in the last decades of the twentieth century." 1974 N. Y. Laws, ch. 507, § 1. Also like the Ohio statute, the New York plan calls for tests that are prepared by the State and administered on the premises by nonpublic school personnel. The nonpublic school thus has no control whatsoever over the content of the tests. The Ohio tests, however, were graded by the State; here there are three types of tests involved, one graded by the State and the other two by nonpublic school personnel, with the costs of the grading service, as well as the cost of administering all three

tests, being reimbursed by the State. In view of the nature of the tests, the District Court found that the grading of the examinations by nonpublic school employees afforded no control to the school over the outcome of any of the tests.

The District Court explained that the state-prepared tests are primarily of three types: pupil evaluation program (PEP) tests, comprehensive ("end-of-the-course") achievement tests, and Regents Scholarship and College Qualifications Tests (RSCQT). 461 F. Supp., at 1125. Each of the tests addresses a secular academic subject; none deals with religious subject matter.[4] The RSCQT examinations are graded by State Education Department personnel, and the District Court correctly concluded that "the risk of [RSCQT examinations] being used for religious purposes through grading is non-existent." *Id.,* at 1128. The PEP tests, administered universally in grades 3 and 6 and optionally in grade 9, are graded by nonpublic school employees, but they "consist entirely of objective, multiple-choice questions, which can be graded by machine and, even if graded by hand, afford the schools no more control over the results than if the tests were graded by the State." *Ibid.* The comprehensive tests, based on state courses of study for use in grades 9 through 12, are also graded on the premises by school employees, but "consist

---

[4] PEP tests are "standardized reading and mathematics achievement tests developed and published by the Educational Department and based on New York State courses of study." App. 28a. Comprehensive tests correspond to the following subject areas: biology; bookkeeping and accounting II; business law; business mathematics; chemistry; earth science; English; French; German; Hebrew; Italian; Latin; 9th-year mathematics; 10th-year mathematics; 11th-year mathematics; physics; shorthand II and transcription; social studies; and Spanish. 461 F. Supp., at 1125, n. 3. The RSCQT tests are divided into two parts. Part 1 is a "test of general scholastic aptitude, containing questions intended to measure ability to think clearly and accurately." App. 38a. Part 2 is "a test of subject matter achievement directly related to courses studied in high school." *Ibid.*

Clearly, the tests at issue are secular in character.

largely or entirely of objective questions with multiple-choice answers." *Id.*, at 1125. Even though some of the comprehensive tests may include an essay question or two, *ibid.*, the District Court found that the chance that grading the answers to state-drafted questions in secular subjects could or would be used to gauge a student's grasp of religious ideas was "minimal," especially in light of the "complete" state procedures designed to guard against serious inconsistencies in grading and any misuse of essay questions. *Id.*, at 1128–1129. These procedures include the submission of completed and graded comprehensive tests to the State Department of Education for review off the school premises.

We see no reason to differ with the factual or legal characterization of the testing procedure arrived at by the District Court. As in *Wolman* v. *Walter,* 433 U. S., at 240, "[t]he nonpublic school does not control the content of the test or its result"; and here, as in *Wolman,* this factor "serves to prevent the use of the test as a part of religious teaching," *ibid.*, thus avoiding the kind of direct aid forbidden by the Court's prior cases. The District Court was correct in concluding that there was no substantial risk that the examinations could be used for religious educational purposes.

The District Court was also correct in its characterization of the recordkeeping and reporting services for which the State reimburses the nonpublic school. Under the New York law, "[e]ach year, private schools must submit to the State a Basic Educational Data System (BEDS) report. This report contains information regarding the student body, faculty, support staff, physical facilities, and curriculum of each school. Schools are also required to submit annually a report showing the attendance record of each minor who is a student at the school." 461 F. Supp., at 1126. Although recordkeeping is related to the educational program, the District Court characterized it and the reporting function as "ministerial [and] lacking ideological content or use." *Id.*,

at 1130. These tasks are not part of the teaching process and cannot "be used to foster an ideological outlook." *Ibid.* Reimbursement for the costs of so complying with state law, therefore, has primarily a secular, rather than a religious, purpose and effect.[5]

IV

The New York statute, unlike the Ohio statute at issue in *Wolman,* provides for direct cash reimbursement to the nonpublic school for administering the state-prescribed examinations and for grading two of them. We agree with the District Court that such reimbursement does not invalidate the New York statute. If the State furnished state-prepared tests, thereby relieving the nonpublic schools of the expense of preparing their own examinations, but left the grading of the tests to the schools, and if the grading procedures could be used to further the religious mission of the school, serious Establishment Clause problems would be posed under the Court's cases, for by furnishing the tests it might be concluded that the State was directly aiding religious education. But as we have already concluded, grading the secular tests furnished by the State in this case is a function that has a secular purpose and primarily a secular effect. This conclusion is not changed simply because the State pays the school for perform-

---

[5] The recordkeeping function, according to the parties' stipulation of facts, involves "collection of data requested from homeroom teachers, pupil personnel services staff, attendance secretaries and administrators; compilation and correlation of data; and filling out and mailing of report." App. 31a. The attendance-taking function is described in similar ministerial terms. *Id.,* at 37a. Of interest is the District Court's finding that "[t]he lion's share of the reimbursements to private schools under the Statute would be for attendance-reporting. According to applications prepared by intervenor-defendant private schools for the 1973–1974 school year, between 85% and 95% of the total reimbursement is accounted for by the costs attributable to attendance-taking, of which all but a negligible portion represents compensation to personnel for this service." 461 F. Supp., at 1126.

ing the grading function. As the District Court observed, "[p]utting aside the question of whether direct financial aid can be administered without excessive entanglement by the State in the affairs of a sectarian institution, there does not appear to be any reason why payments to sectarian schools to cover the cost of specified activities would have the impermissible effect of advancing religion if the same activities performed by sectarian school personnel without reimbursement but with State-furnished materials have no such effect." 461 F. Supp., at 1129.

A contrary view would insist on drawing a constitutional distinction between paying the nonpublic school to do the grading and paying state employees or some independent service to perform that task, even though the grading function is the same regardless of who performs it and would not have the primary effect of aiding religion whether or not performed by nonpublic school personnel. In either event, the nonpublic school is being relieved of the cost of grading state-required, state-furnished examinations. We decline to embrace a formalistic dichotomy that bears so little relationship either to common sense or to the realities of school finance. None of our cases requires us to invalidate these reimbursements simply because they involve payments in cash. The Court "has not accepted the recurrent argument that all aid is forbidden because aid to one aspect of an institution frees it to spend its other resources on religious ends." *Hunt* v. *McNair*, 413 U. S. 734, 743 (1973).[6] Because the recordkeeping and

---

[6] As Mr. Justice Blackmun wrote in *Roemer* v. *Maryland Public Works Bd.*, 426 U. S. 736, 747 (1976) (footnote omitted): "The Court has not been blind to the fact that in aiding a religious institution to perform a secular task, the State frees the institution's resources to be put to sectarian ends. If this were impermissible, however, a church could not be protected by the police and fire departments, or have its public sidewalk kept in repair. The Court never has held that religious activities must be discriminated against in this way." Cf. *New York* v. *Cathedral Academy*, 434 U. S. 125, 134 (1977) ("[T]his Court has never held that freeing

reporting functions also have neither a religious purpose nor a primarily religious effect, we reach the same results with respect to the reimbursements for these services.

Of course, under the relevant cases the outcome would likely be different were there no effective means for insuring that the cash reimbursements would cover only secular services. See *Levitt I*, 413 U. S., at 480; *Committee for Public Education* v. *Nyquist*, 413 U. S., at 774; *Lemon* v. *Kurtzman*, 403 U. S., at 619–622. But here, as we shall see, the New York law provides ample safeguards against excessive or misdirected reimbursement.

## V

The District Court recognized that "[w]here a state is required in determining what aid, if any, may be extended to a sectarian school, to monitor the day-to-day activities of the teaching staff, to engage in onerous, direct oversight, or to make on-site judgments from time to time as to whether different school activities are religious in character, the risk of entanglement is too great to permit governmental involvement." 461 F. Supp., at 1130. After examining the New York statute and its operation, however, the District Court concluded that "[t]he activities subsidized under the Statute here at issue . . . do not pose any substantial risk of such entanglement." *Ibid.* (footnote omitted).

The District Court described the process of reimbursement:

"Schools which seek reimbursement must 'maintain a separate account or system of accounts for the expenses incurred in rendering' the reimbursable services, and they must submit to the N. Y. State Commissioner of Education an application for reimbursement with additional reports and documents prescribed by the Commissioner. . . . Reimbursable costs include proportionate shares of the teachers' salaries and fringe benefits attrib-

private funds for sectarian uses invalidates otherwise secular aid to religious institutions . . .").

utable to administration of the examinations and report-
ing of State-required data on pupil attendance and per-
formance, plus the cost of supplies and other contractual
expenditures such as data processing services. Applica-
tions for reimbursement cannot be approved until the
Commissioner audits vouchers or other documents sub-
mitted by the schools to substantiate their claims. . . .
The Statute further provides that the State Department
of Audit and Control shall from time to time inspect the
accounts of recipient schools in order to verify the cost
to the schools of rendering the reimbursable services. If
the audit reveals that a school has received an amount
in excess of its actual costs, the excess must be returned
to the State immediately. . . ." *Id.*, at 1126, quoting
1974 N. Y. Laws, ch. 507.

We agree with the District Court that "[t]he services for
which the private schools would be reimbursed are discrete
and clearly identifiable." 461 F. Supp., at 1131.[7] The reim-
bursement process, furthermore, is straightforward and sus-
ceptible to the routinization that characterizes most reim-
bursement schemes. On its face, therefore, the New York
plan suggests no excessive entanglement, and we are not pre-
pared to read into the plan as an inevitability the bad faith

---

[7] As the District Court wrote:

"The services for which the private schools would be reimbursed are
discrete and clearly identifiable. A teacher's taking of attendance, ad-
ministration of examinations, and recordkeeping can hardly be confused
with his or her other activities. Although there might be a possibility of
fraud or mistake in the records submitted by private schools of the
teachers' time spent on such activities, the careful auditing procedures
anticipated by § 7 of the Statute should provide an adequate safeguard
against inflated claims. In addition, since the services subsidized under
the Statute are highly routinized, costs of the services for a given size
of class should vary little from school to school, thus enabling the State
to check claims filed by private schools against records maintained by
hundreds of public schools under State supervision." 461 F. Supp., at
1131 (footnote omitted).

upon which any future excessive entanglement would be predicated.[8]

## VI

It is urged that the District Court judgment is unsupportable under *Meek* v. *Pittenger,* 421 U. S. 349 (1975), which is said to have held that any aid to even secular educational functions of a sectarian school is forbidden, or more broadly still, that any aid to a sectarian school is suspect since its religious teaching is so pervasively intermixed with each and every one of its activities. Brief for Appellants 9–11. The difficulty with this position is that a majority of the Court, including the author of *Meek* v. *Pittenger,* upheld in *Wolman* a state statute under which the State, by preparing and grading tests in secular subjects, relieved sectarian schools of the cost of these functions, functions that they otherwise would have had to perform themselves and that were intimately connected with the educational processes. Yet the *Wolman* opinion at no point suggested that this holding was inconsistent with the decision in *Meek.* Unless the majority in *Wolman* was silently disavowing *Meek,* in whole or in part, that case was simply not understood by this Court to stand for the broad proposition urged by appellants and espoused by the District Court in *Levitt II.*

That *Meek* was understood more narrowly was suggested by MR. JUSTICE POWELL in his separate opinion in *Wolman:* "I am not persuaded," he said, "nor did *Meek* hold, that all loans

---

[8] We find no merit whatever in appellants' argument, which was not made below, that the extent of entanglement here is sufficient to raise the danger of future political divisiveness along religious lines. Brief for Appellants 16–18. *Wolman* was decided without reference to any such potential discord. Moreover, the New York plan reimburses "actual costs." Thus it cannot be maintained that the New York system will provoke religious battles over legislative appropriations, an eventuality that could conceivably occur under a system of state aid involving direct appropriations. Cf. *Committee for Public Education* v. *Nyquist,* 413 U. S. 756, 794–798 (1973).

of secular instructional material and equipment" inescapably have the effect of direct advancement of religion. 433 U. S., at 263. And obviously the testing services furnished by the State in *Wolman* were approved on the premise that those services did not and could not have the primary effect of advancing the sectarian aims of the nonpublic schools. With these indicators before it, the District Court properly put the two cases together and sustained the reimbursements involved here because it had been shown with sufficient clarity that they would serve the State's legitimate secular ends without any appreciable risk of being used to transmit or teach religious views.

This is not to say that this case, any more than past cases, will furnish a litmus-paper test to distinguish permissible from impermissible aid to religiously oriented schools. But Establishment Clause cases are not easy; they stir deep feelings; and we are divided among ourselves, perhaps reflecting the different views on this subject of the people of this country. What is certain is that our decisions have tended to avoid categorical imperatives and absolutist approaches at either end of the range of possible outcomes. This course sacrifices clarity and predictability for flexibility, but this promises to be the case until the continuing interaction between the courts and the States—the former charged with interpreting and upholding the Constitution and the latter seeking to provide education for their youth—produces a single, more encompassing construction of the Establishment Clause.

The judgment of the District Court is

*Affirmed.*

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.

The Court in this case, I fear, takes a long step backwards in the inevitable controversy that emerges when a state legislature continues to insist on providing public aid to parochial schools.

I thought that the Court's judgments in *Meek* v. *Pittenger,* 421 U. S. 349 (1975), and in *Wolman* v. *Walter,* 433 U. S. 229 (1977) (which the Court concedes, *ante,* at 654, is the controlling authority here), at last had fixed the line between that which is constitutionally appropriate public aid and that which is not. The line necessarily was not a straight one. It could not be, when this Court, on the one hand, in *Everson* v. *Board of Education,* 330 U. S. 1 (1947), by a 5–4 vote, decided that there was no barrier under the First and Fourteenth Amendments to parental reimbursement of the cost of fares for the transportation of children attending parochial schools, and in *Board of Education* v. *Allen,* 392 U. S. 236 (1968), by a 6–3 vote, ruled that New York's lending of approved textbooks to students in private secondary schools was not violative of those Amendments, and yet, on the other hand, in *Lemon* v. *Kurtzman,* 403 U. S. 602 (1971), struck down, as violative of the Religion Clauses, statutes that, respectively, would have supplemented nonpublic school teachers' salaries and would have authorized the "purchase" of certain "secular educational services" from nonpublic schools, and also in *Levitt* v. *Committee for Public Education,* 413 U. S. 472 (1973) (*Levitt I*), struck down New York's previous attempt to reimburse nonpublic schools for the expenses of tests and examinations. See also *Committee for Public Education* v. *Nyquist,* 413 U. S. 756 (1973), where the Court nullified New York's financial aid programs for "maintenance and repair" of facilities and equipment, a tuition reimbursement plan, and tax relief for parents who did not qualify for tuition reimbursement, and *Sloan* v. *Lemon,* 413 U. S. 825 (1973), where the Court ruled invalid a state plan for parental reimbursement of a portion of nonpublic school tuition expenses. And see *Roemer* v. *Maryland Public Works Bd.,* 426 U. S. 736 (1976).

But, I repeat, the line, wavering though it may be, was indeed drawn in *Meek* and in *Wolman,* albeit with different

combinations of Justices, those who perceive no barrier under the First and Fourteenth Amendments and who would rule in favor of almost any aid a state legislature saw fit to provide, on the one hand, and those who perceive a broad barrier and would rule against aid of almost any kind, on the other hand, in turn joining Justices in the center on these issues, to make order and a consensus out of the earlier decisions. Now, some of those who joined in *Lemon, Levitt I, Meek,* and *Wolman* in invalidating, depart and validate. I am able to attribute this defection only to a concern about the continuing and emotional controversy and to a persuasion that a good-faith attempt on the part of a state legislature is worth a nod of approval.

I

In order properly to analyze the amended school aid plan that the New York Legislature produced in response to its defeat in *Levitt I,* it is imperative, it seems to me, to examine the statute's operational details with great precision and with fewer generalities than the Court does today. One should do more than give a passing glance at selected provisions of the statute, and one should not ignore the considerations that prompted the three-judge District Court initially and *unanimously* to hold New York's revised plan to be unconstitutional, *Committee for Public Education* v. *Levitt,* 414 F. Supp. 1174 (SDNY 1976) (*Levitt II*), and that prompted Judge Ward, in his persuasive dissent in *Levitt III, Committee for Public Education* v. *Levitt,* 461 F. Supp. 1123 (SDNY 1978), after our remand, to differ so vigorously with his two colleagues who meanwhile changed their minds, mistakenly in my view.

II

The Court, *ante,* at 653, and all three judges of the District Court, 461 F. Supp., at 1126, 1131, n. 1, are correct, of course, in recognizing that the "mode of analysis for Establishment

Clause questions is defined by the three-part test that has emerged from the Court's decisions." *Wolman* v. *Walter,* 433 U. S., at 235–236 (plurality opinion). To pass constitutional muster under this test, the New York statute now challenged, Chapter 507, 1974 N. Y. Laws, as amended, "must have a secular legislative purpose, must have a principal or primary effect that neither advances nor inhibits religion, and must not foster an excessive government entanglement with religion." 433 U. S., at 236.

I have no trouble in agreeing with the Court that Chapter 507 manifests a clear secular purpose. See *Levitt I,* 413 U. S., at 479, n. 7. I therefore would evaluate Chapter 507 under the two remaining inquiries of the three-part test.

In deciding whether Chapter 507 has an impermissible primary effect of advancing religion, or whether it fosters excessive government entanglement with sectarian affairs, one must keep in focus the nature of the assistance prescribed by the New York statute. The District Court found that $8–$10 million annually would be expended under Chapter 507, with the great majority of these funds going to sectarian schools to pay for personnel costs associated with attendance reporting. The court found that such payments would amount to from 1% to 5.4% of the personnel budget of an individual religious school receiving assistance under Chapter 507. Moreover, Chapter 507 provides direct cash payments by the State of New York to religious schools, as opposed to providing services or providing cash payments to third parties who have rendered services. And the money paid sectarian schools under Chapter 507 is designated to reimburse costs that are incurred by religious schools in order to meet basic state testing and reporting requirements, costs that would have been incurred regardless of the availability of reimbursement from the State.

This direct financial assistance provided by Chapter 507 differs significantly from the types of state aid to religious schools approved by the Court in *Wolman* v. *Walter.* For

example, in *Wolman* the Court approved that portion of the Ohio statute that provided to religious schools the standardized tests and scoring services furnished to public schools. But, unlike New York's Chapter 507, Ohio's statute provided only the tests themselves and scoring by employees of neutral testing organizations. It did not authorize direct financial aid of any type to religious schools. *Wolman* v. *Walter,* 433 U. S., at 238–239, and n. 7 (plurality opinion).

Similarly, the other forms of assistance upheld in *Wolman* did not involve direct cash assistance. Rather, the Court approved the State's providing sectarian school students therapeutic, remedial, and guidance programs administered by public employees on public property. It also approved certain public health services furnished by public employees to religious school pupils, even though administered in part on the sectarian premises, on the basis of its recognition in a number of cases, see, *e. g., Meek* v. *Pittenger,* 421 U. S., at 364, 368, n. 17, that provision of health services to all schoolchildren does not advance religion so as to contravene the Establishment Clause. 433 U. S., at 241–248. And it upheld the lending by Ohio of textbooks to pupils under the "unique presumption," *id.,* at 252, n. 18, created by *Board of Education* v. *Allen,* 392 U. S. 236 (1968), and reaffirmed since that time. *E. g., Meek* v. *Pittenger,* 421 U. S., at 359–362 (plurality opinion); *id.,* at 388 (opinion concurring in judgment in part and dissenting in part).

It is clear, however, that none of the programs upheld in *Wolman* provided direct financial support to sectarian schools. At the very least, then, the Court's holding today goes further in approving state assistance to sectarian schools than the Court had gone in past decisions. But beyond merely failing to approve the type of direct financial aid at issue in this case, *Wolman* reaffirmed the finding of the Court in *Meek* v. *Pittenger* that *direct* aid to the educational function of religious schools necessarily advances the sectarian enterprise as a whole.

Thus, the Court in *Wolman* invalidated Ohio's practice of loaning instructional materials directly to sectarian schools, "even though the loan ostensibly was limited to neutral and secular instructional material and equipment, [because] it inescapably had the primary effect of providing a direct and substantial advancement of the sectarian enterprise." 433 U. S., at 250. In the same vein, the Court disapproved Ohio's provision of field-trip transportation directly to religious schools as impermissible direct aid that, because of the pervasively religious nature of the schools involved, furthered the religious goals of the schools, and that also required government surveillance of expenditures to such a degree as to foster entanglement of the State in religion. *Id.*, at 252–255.

*Wolman* thus re-enforces the conclusion that substantial direct financial aid to a religious school, even though ostensibly for secular purposes, runs the great risk of furthering the religious mission of the school as a whole because that religious mission so pervades the functioning of the school. The Court specifically recognized this in *Meek:*

> "[F]aced with the substantial amounts of direct support authorized by [the statute at issue], it would simply ignore reality to attempt to separate secular educational functions from the predominantly religious role performed by many . . . church-related elementary and secondary schools and to then characterize [the statute] as channeling aid to the secular without providing direct aid to the sectarian. Even though earmarked for secular purposes, 'when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission,' state aid has the impermissible primary effect of advancing religion. *Hunt* v. *McNair,* 413 U. S. 734, 743." 421 U. S., at 365–366.

See *Wolman* v. *Walter,* 433 U. S., at 249–250; *Committee for Public Education* v. *Nyquist,* 413 U. S., at 781–783, and n. 39.

Under the principles announced in these decided cases, I am compelled to conclude that Chapter 507, by providing substantial financial assistance directly to sectarian schools, has a primary effect of advancing religion. The vast majority of the schools aided under Chapter 507 typify the religious-pervasive institution the very purpose of which is to provide an integrated secular and sectarian education. The aid provided by Chapter 507 goes primarily to reimburse such schools for personnel costs incurred in complying with state reporting and testing requirements, costs that must be incurred if the school is to be accredited to provide a combined sectarian-secular education to school-age pupils. To continue to function as religious schools, sectarian schools thus are required to incur the costs outlined in § 3 of Chapter 507, or else lose accreditation by the State of New York. See, e. g., N. Y. Educ. Law §§ 3210, 3211 (McKinney 1970). These reporting and testing requirements would be met by the schools whether reimbursement were available or not. As such, the attendance, informational, and testing expenses compensated by Chapter 507 are essential to the overall educational functioning of sectarian schools in New York in the same way instruction in secular subjects is essential. Therefore, just as direct aid for ostensibly secular purposes by provision of instructional materials or direct financial subsidy is forbidden by the Establishment Clause, so direct aid for the performance of recordkeeping and testing activities that are an essential part of the sectarian school's functioning also is interdicted. The Court stated in *Meek*, and reaffirmed in *Wolman*:

> "The very purpose of many [religious] schools is to provide an integrated secular and religious education; the teaching process is, to a large extent, devoted to the inculcation of religious values and belief. See *Lemon* v. *Kurtzman*, 403 U. S., at 616–617. Substantial aid to the educational function of such schools, accordingly, necessarily results in aid to the sectarian school enterprise as

a whole. '[T]he secular education those schools provide goes hand in hand with the religious mission that is the only reason for the schools' existence. Within the institution, the two are inextricably intertwined.' *Id.,* at 657 (opinion of BRENNAN, J.)." 421 U. S., at 366, quoted in 433 U. S., at 249–250.

It is also true that the keeping of pupil attendance records is essential to the religious mission of sectarian schools. To ensure that the school is fulfilling its religious mission properly, it is necessary to provide a way to determine whether pupils are attending the sectarian classes required of them. Accordingly, Chapter 507 not only advances religion by aiding the educational mission of the sectarian school as a whole; it also subsidizes directly the religious mission of such schools. Chapter 507 makes no attempt, and none is possible, to separate the portion of the overall expense of attendance-taking attributable to the desire to ensure that students are attending religious instruction from that portion attributable to the desire to ensure that state attendance laws are complied with. This type of direct aid the Establishment Clause does not permit. *Committee for Public Education* v. *Nyquist,* 413 U. S., at 774–780; *Levitt I,* 413 U. S., at 480.

I thus would hold that the aid provided by Chapter 507 constitutes a direct subsidy of the operating costs of the sectarian school that aids the school as a whole, and that the statute therefore directly advances religion in violation of the Establishment Clause of the First Amendment.

### III

Beyond this, Chapter 507 also fosters government entanglement with religion to an impermissible extent. Unlike *Wolman,* under Chapter 507 sectarian employees are compensated by the State for grading examinations. In some cases, such grading requires the teacher to exercise subjective judgment. For the State properly to ensure that judgment is

not exercised to inculcate religion, a "comprehensive, discriminating, and continuing state surveillance will inevitably be required." *Lemon* v. *Kurtzman,* 403 U. S., at 619.

Moreover, Chapter 507 provides for continuing reimbursement with regard to examinations in which the questions may vary from year to year, and for examinations that may be offered in the future. This will require the State continually to evaluate the examinations to ensure that reimbursement for expenses incurred in connection with their administration and grading will not offend the First Amendment. This, too, fosters impermissible government involvement in sectarian affairs, since it is likely to lead to continuing adjudication of disputes between the State and others as to whether certain questions or new examinations present such opportunities for the advancement of religion that reimbursement for administering and grading them should not be permitted. Cf. *New York* v. *Cathedral Academy,* 434 U. S. 125 (1977).

Finally, entanglement also is fostered by the system of reimbursement for personnel expenses. The State must make sure that it reimburses sectarian schools only for those personnel costs attributable to the sectarian employees' secular activities described in § 3 of Chapter 507. It is difficult to see how the State adequately may discover whether the time for which reimbursement is made available was devoted only to secular activities without some type of ongoing surveillance of the sectarian employees and religious schools at issue. It is this type of extensive entanglement that the Establishment Clause forbids. *Lemon* v. *Kurtzman,* 403 U. S., at 617–621. I fail to see, and I am uncomfortable with, the so-called "ample safeguards," *ante,* at 659, upon which the Court and the District Court's majority, *Levitt III,* 461 F. Supp., at 1131, are content to rest so assured.

I therefore conclude that Chapter 507 has a primary effect of advancing religion and also fosters excessive government entanglement with religion. The statute, consequently, is unconstitutional under the Establishment Clause,

at least to the extent it provides reimbursement directly to sectarian nonpublic schools.

I would reverse the judgment of the District Court.

MR. JUSTICE STEVENS, dissenting.

Although I agree with MR. JUSTICE BLACKMUN's demonstration of why today's holding is not compelled by precedent, my vote also rests on a more fundamental disagreement with the Court. The Court's approval of a direct subsidy to sectarian schools to reimburse them for staff time spent in taking attendance and grading standardized tests is but another in a long line of cases making largely ad hoc decisions about what payments may or may not be constitutionally made to nonpublic schools. In groping for a rationale to support today's decision, the Court has taken a position that could equally be used to support a subsidy to pay for staff time attributable to conducting fire drills or even for constructing and maintaining fireproof premises in which to conduct classes. Though such subsidies might represent expedient fiscal policy, I firmly believe they would violate the Establishment Clause of the First Amendment.

The Court's adoption of such a position confirms my view, expressed in *Wolman* v. *Walter,* 433 U. S. 229, 264 (STEVENS, J., concurring in part and dissenting in part), and *Roemer* v. *Maryland Public Works Bd.,* 426 U. S. 736, 775 (STEVENS, J., dissenting), that the entire enterprise of trying to justify various types of subsidies to nonpublic schools should be abandoned. Rather than continuing with the sisyphean task of trying to patch together the "blurred, indistinct, and variable barrier" described in *Lemon* v. *Kurtzman,* 403 U. S. 602, 614, I would resurrect the "high and impregnable" wall between church and state constructed by the Framers of the First Amendment. See *Everson* v. *Board of Education,* 330 U. S. 1, 18.