Alice DECKER, Patricia Hayes, and Marilyn Z. Hempstead, Plaintiffs,

v.

UNITED STATES DEPARTMENT OF LABOR et al., Defendants.

Civ.A.No. 78–C–634.

United States District Court, E. D. Wisconsin.

Feb. 12, 1980.

On Motion for Stay March 12, 1980.

---

Mary Jo Schiavoni and Michael A. Campbell and Raymond Dall'Osto, Milwaukee, Wis., for plaintiffs.

William E. Callahan, Jr., Asst. U. S. Atty., Milwaukee, Wis., Keith M. Werhan and Paul Blankenstein, Attys., Dept. of Justice, Washington, D. C., for Federal defendants; Harry L. Sheinfeld, Atty., Dept. of Labor, Washington, D. C., of counsel.

Bronson C. LaFollette, Atty. Gen., David C. Rice, Asst. Atty. Gen., Madison, Wis., for defendant, Governor Lee S. Dreyfus.

David P. Lowe, Milwaukee, Wis., for defendant, William F. O'Donnell, Milwaukee Co. Executive.

Toby E. Marcovich, Superior, Wis., for defendant, James Bonney, Executive Director, Northwest CEP Prime Sponsor.

Gerald L. Engeldinger, Corp. Counsel, Oshkosh, Wis., for defendant, Alan Wentz, Executive Secretary, WINNE–FOND Consortium.

Henry A. Gempeler, City Atty., and Eunice Gibson, Asst. City Atty., Madison, Wis., for defendant, Pam Anderson, Director, Madison-Dane Consortium.

Victor Moyer, Corp. Counsel, Janesville, Wis., for Kenyon Kies, Director, Rock County Prime Sponsor.

George A. Moore, Director, Racine, Wis., TRICO–CETAC Consortium.

Willis J. Zick, Corp. Counsel, Waukesha County, Waukesha, Wis., for defendant, Leonard Cors, Director, W–O–W Consortium.

James T. Runyon, Wausau, Wis., for defendant, John Cook, Director, Marathon County Prime Sponsor.

Richard L. Hamilton, Corp. Counsel, Outagamie County, Appleton, Wis., for defendant, Jim Lauer, Director, Outagamie County Prime Sponsor.

T. Michael Bolger, Patrick W. Schmidt and Patricia A. Graczyk, Milwaukee, Wis., for intervening defendants; Quarles & Brady, Milwaukee, Wis., of counsel.

## ORDER

REYNOLDS, Chief Judge.

This is an action for injunctive relief brought pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331(a), 1337, 1343(3), and 1361.

Plaintiffs are federal taxpayers, residing in Wisconsin, who seek to enjoin the payment of funds under the Comprehensive Employment Training Act of 1973, 29 U.S.C. § 841 et seq. ("CETA"), to elementary or secondary schools operated by sectarian or religious organizations. Defendants are the United States Department of Labor, Secretary of Labor Ray Marshall, and Milwaukee County Executive William O'Donnell. Defendant-intervenors are the Catholic Archdiocese of Milwaukee, CETA employees Candace Warlin and John Broczek, and the Catholic Dioceses of Madison, Green Bay, LaCrosse, and Superior, Wisconsin.

On July 31, 1979, this Court, D.C., 473 F.Supp. 770, issued a decision and order which *inter alia* enjoined the defendants from "granting, awarding, or contracting for payment of any CETA funds for full-time or part-time employees of any elementary or secondary school operated by or for any religious or sectarian organization." On August 17, 1979, the preliminary injunction was stayed pending further order of the Court. In the meantime, the defendants and the defendant-intervenor Archdiocese of Milwaukee moved for reconsideration and amendment of the injunction. The Court granted the Archdiocese's request to present further evidence, and an evidentiary hearing was held on September 19 and 20, 1979. The Court has considered the written submissions of the parties as well as the testimony elicited at the hearing and now makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. The CETA program was enacted by Congress in 1973 for the purpose of provid-

**840**

ing unemployed and underemployed persons with transitional employment in areas of public service so that such persons can develop job skills and techniques that will enable them to become gainfully employed in the private sector.

2. In order to carry out this purpose, CETA authorizes the Department of Labor to allocate funds to various "prime sponsors" who then distribute funds to "subgrantees" who provide employment to CETA recipients.

3. Milwaukee County is a prime sponsor receiving funds from the CETA program.

4. In fiscal year 1979 (October 1, 1978, through September 30, 1979), approximately ten million dollars in CETA funds were allocated by the Department of Labor to Milwaukee County.

5. The CETA division of the Milwaukee County Executive's office administers the CETA grants from the Department of Labor for use in Milwaukee County.

6. In Milwaukee County, CETA funds are distributed to subgrantees in the following manner: Milwaukee County sends to any organization that so requests a package explaining the CETA program and the applicable regulations, and a request that an interested organization return a proposal that describes its program, the job positions for which it requests funding, and a budget. The CETA division staff rates each proposal and submits its ratings to the CETA Advisory Council which is composed of twenty-one volunteer representatives of specific segments of the public. The CETA Advisory Council, following public hearings, ranks each job proposal requested and submits its nonbinding rankings to the Milwaukee County Executive, defendant William O'Donnell, an elected public official, who then makes the final funding decisions.

7. The Archdiocese of Milwaukee first applied for and received CETA funding for its sectarian schools in 1977.

8. In fiscal year 1979, the Archdiocese of Milwaukee received approximately $143,000 in CETA funds from the County of Milwaukee.

9. The Archdiocese of Milwaukee makes the hiring and firing decisions concerning its CETA employees, determines their salaries, and supervises their work.

10. CETA workers employed by the Archdiocese of Milwaukee are paid by checks issued by the Archdiocese. The Archdiocese is later reimbursed by the Department of Labor.

11. In most respects, Archdiocesean CETA employees are treated indistinguishably from other workers employed by the Archdiocese.

12. In the past, the Archdiocese of Milwaukee has used CETA workers as reading, math, music, and art teachers, teacher's aides, librarians, tutors, learning disability specialists, speech therapists, guidance counselors, maintenance workers, housekeepers, kitchen aides and meal planners, nutrition and health coordinators, day care assistants, typists, clerical aides, and testing specialists.

13. Under new rules promulgated by the Department of Labor, effective September 17, 1979, 20 C.F.R. § 676.71, CETA placements in sectarian schools are limited to the following positions:

(a) Participants in adult educational programs, recreation and summer programs, or other similar activities conducted by sectarian organizations, including remedial tutorial activities, provided that such programs are not offered during regular school hours, are not part of the regular school curriculum, are open to the community at large, and do not involve religious activity.

(b) Persons who are outstationed in sectarian schools for the purpose of providing nonreligious remedial education.

(c) Food service workers.

(d) Persons providing diagnostic or therapeutic speech and hearing services.

(e) Persons providing nursing or health services or other services relating to the health or safety of students.

(f) Persons providing support services for the administration of federally funded or regulated programs made applicable to sectarian institutions.

(g) Persons performing functions with respect to the administration and grading of State-prepared examinations.

(h) Custodial child care workers.

14. Milwaukee County, as a prime sponsor, is required to audit and monitor all subgrantees receiving CETA funds distributed by Milwaukee County.

15. Milwaukee County conducts a financial audit of the Archdiocese of Milwaukee's CETA program on an annual basis.

16. Milwaukee County monitors the Archdiocese of Milwaukee's participation in the CETA program by making annual visits to schools employing CETA workers and reviewing school records regarding the schools' participation in the program.

17. Due to new Department of Labor directives, Milwaukee County plans in the future to conduct more extensive monitoring procedures, including interviewing individual workers and their supervisors.

18. Milwaukee County conducts no ongoing surveillance of the sectarian schools which employ CETA workers.

19. Unless alerted by a CETA worker or his supervisor, Milwaukee County has no way of determining whether CETA employees are or have engaged in religious oriented activities.

20. In the past, CETA workers employed in schools operated by the Archdiocese of Milwaukee have engaged in religious oriented activities such as mailing religious messages to parents and alumni.

## CONCLUSIONS OF LAW

In its July 31, 1979, decision and order, this Court enjoined the defendants from funding the employment of CETA workers in religious and sectarian schools. That decision was based on a number of factors. First, the Court determined that many of the positions filled by CETA workers in the Archdiocese of Milwaukee's parochial schools by their nature created a potential for excessive entanglement between church and State. Second, the Court determined that the auditing and review procedures mandated by the CETA program led to excessive government interference in church affairs. Finally, the Court determined that the allocation of CETA funds to sectarian schools and the concomitant political pressure that religious groups can bring to bear on elective officials could lead to an excessive political entanglement between church and State in that political decisions concerning the allocation of tax funds were likely to involve predominately religious considerations.

On these motions for reconsideration and amendment, defendants and defendant-intervenors have sought to challenge the factual bases for the Court's decision. First, defendants argue that under the new Department of Labor rules, CETA workers in sectarian schools are limited to jobs which do not in themselves present any danger of church-State entanglement. Second, defendants have produced testimony which, they argue, shows that the monitoring and audit provisions of the CETA program do not in practice lead to excessive government interference in church affairs.

Although the new rules promulgated by the Department of Labor prohibit CETA workers from performing many job functions which clearly had a potential for excessive entanglement, such as teachers and teacher's aides, many of the new jobs permitted by the rules share a similar defect. For example, the outstationing of remedial education teachers in parochial schools was specifically prohibited by the Supreme Court in *Meek v. Pittenger*, 421 U.S. 349, 367–73, 95 S.Ct. 1753, 1764–67, 44 L.Ed.2d 217 (1975). Similarly, speech and hearing therapy which is performed on the premises of a sectarian school was invalidated by the Supreme Court in *Meek* on entanglement grounds. While the Supreme Court has not considered the constitutionality of state subsidization of adult education and recreation programs sponsored by religious institutions, I am of the opinion that such subsidization has a clear potential for fostering religion to the extent that such programs take place on parochial school grounds and are operated by sectarian employees. Thus, while the nature of the job

positions that may be funded through the CETA program are limited by the new Department of Labor rules, many of the newly authorized positions present a substantial danger of excessive entanglement between church and State.

Defendants argue that the testimony adduced at the evidentiary hearing shows that the monitoring which is actually performed by Milwaukee County has had little impact on the operation of the sectarian schools administered by the Archdiocese of Milwaukee. It is true that the procedures that have actually been followed have had little impact on those schools and in fact has enabled the Archdiocese to use funds for religious purposes.

The monitoring procedures that will be used in the future will be more thorough and comprehensive than those that are currently utilized and are designed to prevent the use of the funds for religious purposes. For instance, Milwaukee County plans to interrogate CETA workers and sectarian school officials concerning possible exposure to religious influences. Even more comprehensive are the measures that the Department of Labor has mandated to insure that adult educational and recreational programs operated by sectarian institutions are religiously neutral. According to a memorandum issued by the Department of Labor on September 17, 1979, prime sponsors who place CETA workers in such programs are required to insure that program contents are the same as programs administered by the public schools, that educational materials used in such programs be the same as those commonly used in the public schools, and that the facilities used for such programs be free from "sectarian influence or appearance." In order to comply with the Department of Labor directives, a prime sponsor would have to engage in precisely the "comprehensive, discriminating, and continuous state surveillance" of religious institutions which is prohibited by the establishment clause of the First Amendment. *Lemon v. Kurtzman*, 403 U.S. 602, 619, 91 S.Ct. 2105, 2114, 29 L.Ed.2d 745 (1971).

■ While the impact of past monitoring procedures on the Archdiocesean school system is certainly probative, it is not dispositive of the issue of excessive entanglement. An examination of recent Supreme Court case law shows that the effect of State supervision is not measured by the practices that are actually followed, but rather by the practices that it would be necessary to follow in order to insure that public funds are not used to support religious activities. Thus, while the monitoring procedures that have been utilized by Milwaukee County have not in fact amounted to continuous surveillance of parochial schools, at the same time such procedures have been insufficient to detect improper religious activities. For example, testimony elicited at the hearing revealed that one former CETA worker who was employed in the mail room at a high school operated by the Archdiocese of Milwaukee sent out a school newsletter containing explicit religious messages. This activity was not discovered through the standard annual review of the CETA program, nor is it likely that it could have been.

The point is that were Milwaukee County to utilize a monitoring system that was designed to detect improper work assignments such as the example noted above, the result would be an extensive day-to-day involvement in the Archdiocesean school system. While some of the work assignments permitted by the new Department of Labor rules may be thought of as self-policing in that there is no opportunity for the employee to engage in prohibited religious activity (i. e., the position of cafeteria worker), the great majority of the permissible positions involve face-to-face contact between parochial employees (who are paid with CETA funds) and students in at least a quasi-educational setting and thus involve the potential for abuse. This requires a monitoring system which is much more comprehensive and intrusive than the system that has been used by Milwaukee County. The implementation of such a system, however, would excessively entangle the government with the operation of sectarian schools. In effect, the Archdiocese is

in a Catch-22 situation. If the funds are not effectively audited, the program would fail because it would amount to a grant of federal funds to a religious organization, and if they are audited, it would result in excessive entanglement. It was in part for this very reason that the founding fathers provided for the separation of the State and the church in this country.

■ The auditing and review procedures are not the only aspects of the CETA program that lead to excessive entanglement of church and State. In my opinion, the very structure of the program as applied to sectarian employees leads to state subsidization of religion. CETA workers employed in Archdiocesean schools are for all intents and purposes employees of the Archdiocese of Milwaukee. They receive their pay checks from the Archdiocese, they are hired and fired at the pleasure of the Archdiocese, and they receive their day-to-day supervision from Archdiocesean officials. In no way can CETA workers in Archdiocesean schools be thought of as government employees. Yet it is the government which is ultimately responsible for paying their salaries. No matter what positions are filled by these workers, this type of direct subsidization provides the affected religious institutions with direct and tangible benefits. When such benefits are conferred out of public funds, the result is a violation of the First Amendment.

The above discussion has focused upon what is known as administrative entanglement, that is, upon the extent of the government involvement into religious affairs that is made necessary by the funding of employment positions in sectarian schools. This analysis depends to some extent upon the nature of the positions that are funded. As already noted, many of the employment positions authorized by the new Department of Labor rules by their nature require extensive government involvement to insure religious neutrality. These are the positions which involve face-to-face contacts by the employees with students in an educational or quasi-educational setting. Some of the positions authorized by the new rules, however, do not have the same potential for religious indoctrination as those discussed above, and thus arguably do not require the same sort of strict supervision as would otherwise be required. These positions include cafeteria and maintenance workers and administrators of State prepared examinations. In spite of the lessened necessity of direct supervision, however, I cannot validate the use of tax money to fund such positions, at least as such funding is currently administered.

■ The method by which CETA funding is allocated is highly susceptible to what is known as political entanglement when religious institutions are allowed to become potential recipients. Political entanglement occurs when a government program has the potential to engender political division along religious or sectarian lines. *Meek, supra,* 421 U.S. at 372, 95 S.Ct. at 1766. The danger that is to be guarded against is the competition among religious groups to gain or maintain the support of the government. *Committee for Public Education v. Nyquist,* 413 U.S. 756, 796, 93 S.Ct. 2955, 2977, 37 L.Ed.2d 948 (1973). This danger is intensified when a funding program involves "successive and very likely permanent annual appropriations that benefit relatively few religious groups." *Lemon v. Kurtzman,* 403 U.S. 602, 623, 91 S.Ct. 2105, 2116, 29 L.Ed.2d 745 (1971).

■ The statutorily mandated method whereby a prime sponsor allocates funds to subgrantees involves just the sort of political entanglement warned against in *Lemon* and *Nyquist.* The process is a competitive one in that more groups and organizations apply for funds than there are funds available. The final decision on which groups will receive CETA funding rests with one man, defendant William O'Donnell, an elected public official. It is unavoidable that large organized religious institutions will bring political pressure to bear in order to be assured of continued CETA funding. It may also be that persons who oppose the funding of religious organizations will also attempt to exert political influence upon the funding decisions. In either case, public

policy decisions are unavoidably entangled with sectarian or anti-sectarian concerns. Such concerns are an unconstitutional basis for a public official to make decisions involving public spending. A system which engenders such influences and which brings religious factionalism to bear on matters of public policy offends the establishment clause of the First Amendment. This conclusion is emphasized by the fact that the principal beneficiary of CETA funding of employment in sectarian schools is the Roman Catholic Church which is an organized religion of some moment in our society. The divisive effect of programs which provide public funds to one or more religious groups is spread across the pages of the history books and when such benefits are appropriated annually at the discretion of a single elected public official, the divisive effect renders the program unconstitutional.

Defendants urge that the July 31 injunction be modified so as to apply only to the CETA program as administered by Milwaukee County. The unconstitutionality of the CETA program as applied to parochial schools, however, does not depend upon how the program was operated in Milwaukee County but rather depends upon the inherent defects in the types of positions that the Department of Labor allows to be funded and upon the potential for political entanglement that lies with the statutorily mandated allocation procedure. In other words, the CETA program, to the extent that it funds employment positions in sectarian schools, is invalid on its face. Accordingly, the request to limit the geographical scope of the preliminary injunction must be denied.

Finally, plaintiffs' motion for class certification will be denied. By its very nature the relief ordered will benefit the proposed class, whether or not it is certified as such. This renders formal certification unnecessary.

### ORDER

IT IS THEREFORE ORDERED that the motions of the defendants United States Department of Labor and Secretary of Labor Ray Marshall and the defendant-intervenor Archdiocese of Milwaukee for amendment and reconsideration of the decision and order issued by this Court on July 31, 1979, be and hereby is denied.

IT IS FURTHER ORDERED that plaintiffs' motion for class certification be and hereby is denied.

IT IS FURTHER ORDERED that the stay issued by this Court on August 17, 1979, is dissolved, and that the defendants be preliminarily enjoined as provided by this Court's order of July 31, 1979.

### On Motion for Stay

On February 12, 1980, this court issued a decision and order enjoining the defendants from funding Comprehensive Employment Training Act ("CETA") positions in sectarian elementary or secondary schools. Defendants have now moved for a stay of that order. The motion will be denied.

Rule 62(c) of the Federal Rules of Civil Procedure provides:

"When an appeal is taken from an interlocutory or final judgment granting * * * an injunction, the court, *in its discretion* may suspend [or] modify * * an injunction during the pendency of the appeal * * *. * * *" (Emphasis added.)

Once an injunction has been granted, the party seeking the stay must show (1) that he is likely to prevail on the merits of the appeal, (2) that he will suffer irreparable injury if the stay is denied, (3) that other parties would not be substantially harmed by the stay, and (4) that a stay would be in the public interest. *Armstrong v. O'Connell,* 416 F.Supp. 1325, 1329 (E.D. Wis.1976).

This Court is not convinced that defendants have demonstrated that they are likely to prevail on appeal. For the most part, defendants have restated their arguments in opposition to the issuance of the injunction. These arguments have already been fully discussed in the Court's earlier decision and need not be repeated here.

Defendants also rely on the recently decided case of *Committee for Public Education and Religious Liberty v. Regan,* —— U.S. ——, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980). In that case, the United States Supreme Court upheld the constitutionality of a New York statute authorizing the use of public funds to reimburse sectarian schools for performing, testing and reporting services mandated by state law. In that case, however, the funds were used for a specific, narrowly-drawn, nonsectarian purpose which could be audited without any danger of excessive entanglement with the schools' day-to-day operations. None of these safeguards are present in the CETA program as applied to sectarian schools. Furthermore, the CETA program presents a grave risk of "political entanglement," a risk not present in the New York statute at issue in *Regan.* In short, *Regan* does not stand for the proposition that all direct government payments to sectarian schools are now constitutionally permissible. *Regan* merely holds that in certain carefully defined circumstances the government may reimburse sectarian schools for expenses which the government itself has necessitated. Had *Regan* been decided before this court's decision was rendered, the result would have been no different. Accordingly, the Court is not of the opinion that defendants' chances on appeal have been strengthened.

The final three criteria that must be considered when determining whether an injunction should be stayed involve the competing burdens which would be imposed were the injunction to be continued, considered in light of the public interest. It is evident that both sides will suffer injury if the other side prevails. The injuries are of entirely different natures and are difficult to compare in any meaningful fashion. The Court is convinced, however, that the public interest is best served if the law is upheld. The Court is further convinced that the law prohibits the type of funding at issue in this lawsuit. While not unmindful of the government's claim that many CETA workers now employed in sectarian schools will be unable to be transferred, it should also be noted that the government has been aware of the possibility of this injunction for quite some time and cannot now be heard to claim unfair surprise.

IT IS THEREFORE ORDERED that defendant's motion for a stay of the Court decision and order of February 12, 1980, is hereby denied.