# Proposed Cooperative Agreement for the Administration of the San Antonio Missions National Historical Park

The proposed cooperative agreement between the Secretary of the Interior and the Archbishop of San Antonio, for the administration of church-owned properties within the San Antonio Missions National Historical Park, does not on its face present such a risk of advancing religion or involving the government in an entangling relationship with the church, in violation of the Establishment Clause of the First Amendment, that it may not be executed.

Any federal funds to be expended under the agreement would not relieve the church of any obligation it would otherwise have, or confer any recognizable benefit on the church, and thus could not be said to "advance" religion within the meaning of the test set forth in *Lemon* v. *Kurtzman*, 403 U.S. 602, 612–13 (1971). Nor is the extent of the federal presence at the Missions contemplated by the proposed agreement likely to confer any imprimatur of government approval on a religious sect or practice, or commit the government to religious goals.

December 2, 1982

## MEMORANDUM OPINION FOR THE SOLICITOR OF THE INTERIOR

This responds to your request for our opinion whether a proposed agreement between the Secretary of the Interior and the Archbishop of San Antonio, as owner of the Spanish Missions of San Antonio, violates constitutional provisions regarding the separation of church and state. This agreement, dated May 5, 1982, was developed pursuant to the authority given the Secretary in § 201 of Pub. L. No. 95–629, 92 Stat. 3636 (1978), 16 U.S.C. § 410ee (Supp. II 1978) (Act), which established the San Antonio Missions National Historical Park (Park). Section 201(b) of the Act authorizes the Secretary to acquire certain historic properties within the established boundaries of the Park, and to enter into "cooperative agreements" with the owners of those properties "in furtherance of the purposes of [the Act]." In apparent recognition of the possible issues under the Establishment Clause of the First Amendment which might be raised by cooperative agreements relating to the administration of properties within the Park, § 201(b) of the Act also specifies that:

> the Secretary shall submit all proposed cooperative agreements to the Department of Justice for a determination that the proposed agreements do not violate the constitutional provisions regarding the separation of church and state.

We have reviewed the terms of the proposed cooperative agreement in light of additional factual information provided us by members of your staff and by the

717

Superintendent of the Park in San Antonio, and find no basis on which to object to its execution on Establishment Clause grounds.

In the following discussion we briefly review the history of the Missions and their present-day function and operation, and describe the relevant provisions of the proposed cooperative agreement. We then analyze the agreement in terms of applicable principles of constitutional law.

## I.

The San Antonio Missions National Historical Park was established in 1978 "[i]n order to provide for the preservation, restoration and interpretation of the Spanish Missions of San Antonio, Texas, for the benefit and enjoyment of present and future generations of Americans . . . ." 16 U.S.C. § 410ee(a). The Park consists of four 18th century Spanish missions located on alternate sides of the San Antonio River as it flows through the southern part of the city,[1] and an associated irrigation system which includes an 18th century aqueduct and dam. The Missions contain within their walled compounds a variety of structures which reflect the institution's several historic functions.[2]

In addition to a church and associated buildings, three of the four Missions include some portion of the land and many of the non-religious structures which were once enclosed by the mission walls. These structures, in varying states of disrepair and decay, include granaries, shops, schools, kilns, and living quarters for the Indians whom the missionaries sought to convert and "civilize." All that remains of Mission Concepcion, the closest of these Missions to downtown San Antonio, is a church and "convento," which historically contained the priest's living quarters, offices, a refectory, and sometimes shops and workrooms.

Ownership of the land and structures within the present boundaries of the Missions has remained in the hands of the Roman Catholic Archdiocese of San Antonio. And, at each of the four Missions there is an active parish church which is used today for a variety of religious and ceremonial purposes. Between 500 and 900 families are served by each of the Mission parishes. None of the Mission parishes has a community hall, an adult education program, or any other regular parish activity beyond the weekly religious services themselves. Except for a parish priest who occupies living quarters within the compound at two of the Missions, there are no religious or other church personnel in residence or regularly present at any of the four Missions.

All four of the Missions are separately listed on the National Register of Historic Places, 16 U.S.C. § 470a, and are open to the sightseeing public.

---

[1] The four Missions are described in § 201(a) of the Act as "Concepcion, San Jose, San Juan, and Espada." *See* 16 U S C. § 410ee(a). We use these shortened versions of the full names whenever we refer separately in this memorandum to one of the Missions

[2] According to an "Environmental Assessment" prepared by the National Park Service in October 1981, the Spanish missions in the Southwest were originally established both as religious institutions and as fortresses by which the Spanish extended and defended their frontiers in the Western Hemisphere. The Missions prospered and declined over a period of about 60 years, and by the early 19th century had ceased to operate as an arm of the Spanish government. Since that time, the San Antonio Missions have experienced neglect and decay despite their recognized historic and architectural significance. Notable among the sporadic attempts to preserve and reconstruct them in the last century are those of the federal Works Project Administration during the 1930s.

Mission San Jose has the most extensive interpretive program, and under a 1941 agreement is administered jointly by the Texas Parks and Wildlife Department and the Archdiocese of San Antonio.[3] The three other Missions are administered by the Archdiocese alone, and at each an informational leaflet is made available by the Archdiocese to complement a self-guided tour. Other than the limited state funds which have been made available for upkeep and maintenance at Mission San Jose, the Archdiocese is now solely responsible for the cost of preserving and maintaining the Missions.

## II.

The proposed cooperative agreement between the Secretary and the Archbishop, negotiated by the Secretary pursuant to the authority given him in § 201(b) of the Act,[4] contemplates a comparatively limited federal financial commitment to the Park.[5] Ownership of the Missions remains with the Catholic Church, as does responsibility for their "overall maintenance, repair and security." The Secretary is authorized by the Archbishop to "provide public interpretation of the Missions' secular historical significance in the development of the Southwest Region of the United States." In furtherance of this purpose, the Secretary is given free access to the Mission grounds and "secular Mission buildings,"[6] the use of the latter for administrative purposes, and authority to erect "informational and interpretive signs and exhibits on the Missions grounds." The Secretary in turn undertakes to provide "wear and tear maintenance and repair of the Missions grounds and secular buildings as occasioned by the use of the property for [Park] purposes," and "such security of the Missions grounds and secular buildings as is appropriate in light of the hours of public access." He agrees also to pay the cost of utilities occasioned by Park use. Finally,

---

[3] The Secretary of the Interior was also a party to the 1941 agreement by which the State of Texas undertook to assist the Catholic Archdiocese in its maintenance and administration of the San Jose Mission In that agreement, the Secretary agreed to designate Mission San Jose as a National Historic Site, to "cooperate" with the Archbishop and the state in the "preservation and use" of the Mission as a historic site, and to "provide technical assistance in planning and executing measures for such preservation and use, within the limits of available appropriations." We have been informed by members of your staff that no appropriated funds have ever been allocated by the Secretary of the Interior pursuant to the 1941 agreement. We do not know whether federal funds have otherwise been made available in the past for the preservation and use of the Missions. *See, e.g.*, 16 U S C. § 470a(a), which authorizes the Secretary of the Interior to make grants to states for the development and preservation of properties listed on the National Register of Historic Places.

[4] Section 201(b) of the 1978 Act authorized the Secretary of the Interior "to enter cooperative agreements with the owners of any historic properties" within the boundaries of the Park, including the four Missions themselves, "in furtherance of the purposes of [the Act]." 16 U.S.C. § 410ee(b)(2) Each such cooperative agreement was to include terms obligating the owner of the property to preserve its historic features, and to allow the public "reasonable access to those portions of the property to which access is necessary in the judgment of the Secretary for the proper appreciation and interpretation of its historical and architectural value " 16 U S C. § 410ee(b). In addition, the Secretary was authorized to agree to maintain and operate such interpretive facilities and programs on the land as he deemed appropriate. *Id.* Whatever funds are necessary for the administration of the Park may be allocated by the Secretary from the general appropriation for the National Park System, pursuant to the authority contained in 16 U S.C § 3 *et seq.*

[5] The agreement is described in its preamble as "an interim means to further the purposes of the Act pending consideration of related budgetary and legal issues by the Secretary."

[6] "Secular Mission buildings" are identified in an exhibit appended to the agreement, and comprise all structures within the Mission compound except the present-day church and, in the case of Missions San Juan and Espada, the nearby pastor's residence.

719

the Secretary must not "undertake any actions or activities which disturb the structural integrity and condition of the Missions or the Archbishop's use of the Missions for religious or other church purposes . . . ."

The agreement allows the Archbishop unconditionally to continue the "ecclesiastical use" of the Missions. However, he must not alter or remove any of the Missions' historic features, or erect any markers or structures on their premises "without the prior concurrence of the Secretary." While Park visitors may be permitted to enter non-secular buildings within the compound without charge, the Secretary assumes no responsibility for the maintenance of those buildings. In addition, the agreement expressly provides that

> The Secretary shall not participate in any activities conducted by the Archbishop within non-secular buildings of the Missions nor shall he participate in any religious or other church uses of the Mission grounds.[7]

The agreement may be amended at any time by mutual agreement, and terminated by either party upon 60 days' written notice. At the expiration or termination of the agreement, the Secretary agrees to "remove all property of the United States from the Mission at his expense."[8]

## III.

The general test for determining whether a legislative enactment violates the Establishment Clause was set forth by the Supreme Court in *Lemon* v. *Kurtzman*, 403 U.S. 602, 612–13 (1971):

> First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion . . .; finally, the statute must not foster "an excessive government entanglement with religion."

*See Committee for Public Education* v. *Regan*, 444 U.S. 646 (1980). This three-part test is equally applicable to governmental actions and policies based on a legislative enactment, such as the execution and administration of the cooperative agreement at issue here. *See Widmar* v. *Vincent*, 454 U.S. 263 (1981); *Allen* v. *Morton*, 495 F.2d 65, 68 (D.C. Cir. 1973).

We agree readily with your opinion that the agreement satisfies the "secular purpose" aspect of the *Lemon* test. The stated purpose of the Secretary, in entering into the cooperative agreement, is "to provide public interpretation of the Missions' secular historical significance in the development of the Southwest

---

[7] The Archbishop agrees to provide the Secretary reasonable notice of all religious and other church use of the Missions, and to hold the Secretary harmless against all damage claims by persons "attending a religious service or other church activity conducted by the Archbishop."

[8] The proposed cooperative agreement also suspends for the period of its duration the 1941 agreement between the Secretary, the Archbishop, and the state. *See* note 6, *supra*.

Region of the United States . . . ." This secular purpose is consistent with that of Congress in establishing the Park.[9]

We also concur with your view that the "principal or primary effect" of the agreement is not one which "advances [or] inhibits religion." It is true that, in construing this aspect of the *Lemon* test, the Supreme Court has disapproved the use of public funds to provide support to sectarian institutions even where the funds have themselves been earmarked exclusively for "secular" purposes, on the grounds that "in aiding a religious institution to perform a secular task, the [government] frees the institution's resources to be put to sectarian ends." *Roemer* v. *Board of Public Works of Maryland,* 426 U.S. 736, 748 (1976).[10] In this case, however, no federal funds are to be provided directly to either the Archdiocese or the parish churches within the Mission walls, and no expenditure is authorized which would indirectly relieve either of any obligation it would otherwise have. Indeed, it would appear that federal funds expended under the agreement will not confer any recognizable benefit on the Archdiocese or parish churches. While the legislation which established the Park authorizes a more extensive use of federal funds in connection with the restoration and rehabilitation of the Missions, the cooperative agreement explicitly limits the federal financial commitment to such "wear and tear maintenance" and "security" as is occasioned by the use of the Missions as a National Park. Given the almost certain need for additional maintenance occasioned by this use, we do not believe an agreement by the federal government to pay its cost could be regarded as conferring a benefit on or otherwise advancing the interests of a religious institution.[11]

It is of course possible to argue that the very presence of a national park at the Missions will have some tendency to "advance religion" by enhancing the visibility of and facilitating public access to religious functions, both past and present. However, any such effect is at this point entirely speculative. Even if this

[9] While the introductory phrases of the Act speak generally of the "preservation, restoration and interpretation" of the Missions, subsequent provisions in the law make clear that Congress' interest in the Missions was confined to their "historical and architectural value." *See* 16 U.S C § 410ee(b) and (d). The secular purpose of the legislation is confirmed by its legislative history. *See* 124 Cong. Rec 36192 (1978) (remarks of Sen. Bentsen) *See generally San Antonio Missions National Historical Park, Texas: Hearings on H R 14064 Before the Subcomm on National Parks and Recreation of the House Comm. on Interior and Insular Affairs,* 94th Cong., 2d Sess (1976); *San Antonio Missions National Historical Park, Texas: Hearings on S. 1156 Before the Subcomm on Parks and Recreation of the Senate Comm. on Energy and Natural Resources,* 95th Cong., 1st Sess. (1977) The legislation establishing the Park was never reported out of committee in either House or Senate, but was added as a floor amendment in the Senate to a bill dealing, *inter alia,* with the Pennsylvania Avenue Development Corporation *See* 124 Cong. Rec. 36183 (Oct. 12, 1978)

[10] *Compare Meek* v. *Pittenger,* 421 U S 349 (1975) (state may not provide auxiliary instructional material and services to sectarian schools) and *Committee for Public Education* v. *Nyquist,* 413 U.S. 756 (1973) (lump sum grants to sectarian schools for building maintenance and repair prohibited); *with Wolman* v. *Walter,* 433 U.S. 229 (1977) (state funds may be used to provide standardized tests and scoring services to sectarian schools) and *Committee for Public Education* v *Regan,* 444 U.S. at 654 (1980) (state may reimburse sectarian schools for costs of state-mandated tests)

[11] If enough federal money were spent in connection with maintenance and security at the Missions, some question might be raised as to whether a monetary benefit was in fact being conferred on the Archdiocese or parishes. However, it is our understanding from discussions with the Superintendent of the Park that the budget presently projected for the Park for fiscal 1983 permits an overall commitment to the four Missions of only about $125,000 for maintenance, of which about $75,000 would go to pay custodial salaries and another $50,000 to contract for such basic services as trash collection and weed removal Another $12,000 is available for "natural resource management." There is no money in the 1983 budget for "repairs "

effect could at some future point be shown, we doubt that it would be regarded as "primary," as that term has been construed by the Supreme Court. The Court has "put to rest any argument that the [government] may never act in such a way that has the incidental effect of facilitating religious activity." *Roemer* v. *Board of Public Works of Maryland*, 426 U.S. at 747. And a number of courts have ruled that governmental sponsorship of the secular aspects of religious institutions and ceremonies does not impermissibly advance religion. *See, e.g., Florey* v. *Sioux Falls School District*, 619 F.2d 1311 (8th Cir.), *cert. denied*, 449 U.S. 987 (1980) (school board's adoption of policy permitting observance of religious holidays did not unconstitutionally advance religion); *Allen* v. *Hickel*, 424 F.2d 944 (D.C. Cir. 1970) (government sponsorship of Christmas Pageant of Peace, which included Nativity crèche, did not have primary effect of advancing religion); *Citizens Concerned* v. *City and County of Denver*, 526 F. Supp. 1310 (D. Colo. 1981) (public funds may be used for Nativity scene as part of city's Christmas display). *Compare Fox* v. *City of Los Angeles*, 587 P.2d 663 (Cal. 1978) (display of lighted Latin cross on city hall prohibited, on grounds that it impermissibly favored one religion over others). The government's proposed interpretive program for the Park focuses on the Missions' historical and architectural aspects; any reference to the Missions' historically religious character is likely to have "only a remote and incidental effect advantageous to [the Catholic Church]." *Committee for Public Education* v. *Nyquist, supra*, 413 U.S. at 784 n.39. Nor do we think that Park visitors' access to the active parish churches within the Missions will necessarily advance religion in a constitutionally impermissible manner. While sightseers may have an opportunity on their own initiative to enter the non-secular buildings on the Mission grounds, these buildings will not be integrated into the Park's interpretive program. Nor will Park staff or other government officials be permitted to participate in any religious activities in those buildings or on Mission grounds.[12]

Finally, the extent of the federal presence at the Missions contemplated by the cooperative agreement is not likely to "confer any imprimatur of [governmental] approval on religious sects or practices," or "commit the [government] . . . to religious goals." *Widmar* v. *Vincent, supra*, 454 U.S. at 274. *Compare Gilfillan* v. *City of Philadelphia*, 637 F.2d 924, 930 (3d Cir. 1980) (extensive involvement of public officials with religious personnel in planning the Pope's visit, and expenditure of public funds on altar and loudspeakers, had effect of "placing the City's imprimatur of approval on the Catholic religion"). Properly administered in accordance with the terms of the agreement, the government's program at the Park will be "confine[d] . . . to secular objectives, and neither advance nor impede religious activity." *Roemer* v. *Board of Public Works of Maryland*, 426 U.S. at 747.

---

[12] We do not know how extensive the "religious and other church uses of the Missions grounds" referred to in the agreement will be. It is possible that frequent and extensive use of the Mission buildings and grounds for religious ceremonies, during hours when they are open to the sightseeing public and staffed by Park Service personnel, could give rise to the appearance of an "imprimatur of [governmental] approval" of religious practices generally and those of the Catholic Church in particular. Our discussion with members of your staff and the Park Superintendent suggest no basis for concern that this will occur

With regard to the third and last part of the *Lemon* test, we do not believe that the relationship between the government and the church contemplated by the proposed cooperative agreement presents any substantial risk of "excessive and enduring entanglement between state and church." *Lemon* v. *Kurtzman*, 403 U.S. at 619. The Supreme Court has been particularly concerned with the potential for state-church entanglement where direct money subsidies to sectarian institutions are involved. In *Lemon* the Court remarked that "[t]he history of government grants of a continuing cash subsidy indicates that such programs have almost always been accompanied by varying measures of control and surveillance." 403 U.S. at 621. *See also Levitt* v. *Committee for Public Education*, 413 U.S. 472, 480 (1973). Here, however, no financial benefit accrues to the Archdiocese or the Mission parishes so as to necessitate the kind of prophylactic administrative measures which the Court has found likely to produce excessive entanglement. Moreover, the agreement requires no regular or recurring contact between federal officials and either the Archdiocese or the Mission parishes. While the agreement does provide that each party should "appoint a representative on site at the Missions to deal with routine Missions management," (p. 6) there is no area of joint church-state responsibility which is likely to produce "an intimate and continuing relationship" between these representatives. 403 U.S. at 622. The agreement gives church officials no role in or authority over the federal government's interpretive or maintenance program at the Missions. At the same time, it expressly prohibits Park officials from participating in any religious or other church uses of the Mission buildings or grounds. *Compare* the extensive involvement of federal officials in the planning and administration of the Christmas Pageant of Peace, held unconstitutional on entanglement grounds in *Allen* v. *Morton*, 495 F.2d 65 (D.C. Cir. 1973). The only provision in the agreement which seems to require some official contact between governmental and church officials is that which prohibits the Archbishop from altering or removing any of the Mission's historic features, or erecting markers or structures on their premises, "without the prior concurrence of the Secretary." *See supra*. While we have no doubt that these and other provisions in the agreement will result in some contact from time to time between government and church officials, we do not think the agreement as a whole or any provision of it necessarily leads to the sort of "intimate and continuing relationship" forbidden by the Supreme Court in *Lemon*.[13]

*Lemon* also recognized a second branch of the entanglement test, the possibility that governmental action will result in intensified "[p]olitical fragmentation and divisiveness on religious lines" because of "the need for continuing annual appropriations and the likelihood of larger and larger demands as costs

---

[13] The mere presence of the parish churches within the Mission grounds need not lead to an entangling relationship. *Cf Lanner* v. *Wimmer*, 662 F.2d 1349, 1360 (10th Cir. 1981) (physical proximity of buildings and shared communications system does not preclude public school from implementing released time program with religious seminary on "entanglement" grounds) As previously noted, with the exception of the parish priests in residence at Missions Espada and San Juan, there are no religious personnel regularly present at any of the Mission sites. And, we have been informed by the Park Superintendent that the Archdiocese does not contemplate continuing any aspect of its own interpretive program at the Missions once the federal program is in place

and populations grow." 403 U.S. at 623. However, like the reimbursement scheme held constitutional in *Committee for Public Education* v. *Regan, supra,* the cooperative agreement "[o]n its face . . . suggests no excessive entanglement, and we are not prepared to read into the [agreement] as an inevitability the bad faith upon which any future excessive entanglement would be predicated." 444 U.S. at 660–61.

## IV.

In summary, the cooperative agreement between the Secretary and the Archbishop for the administration of the San Antonio Missions as part of the Park does not present such an "appreciable risk" of advancing religion or involving the government in an impermissible relationship with the church that it may not be executed. *See Committee for Public Education* v. *Regan, supra,* 444 U.S. at 662. We emphasize, however, that while we do not believe the agreement on its face violates the Establishment Clause, the constitutionality of any given church-state relationship depends to some extent on its own particular facts. We therefore cannot know in advance whether specific Establishment Clause problems will arise in connection with the implementation and administration of the agreement. We expect, though, that appropriate precautionary measures can be devised by the Secretary and the National Park Service to minimize the likelihood of such problems occurring.

RALPH W. TARR
*Deputy Assistant Attorney General*
*Office of Legal Counsel*
