The Honorable Kay O'Connor State Representative, Fourteenth District State Capitol, Room 303-N Topeka, Kansas 66612
Dear Representative O'Connor:
As representative for the fourteenth district, you request our opinion regarding whether the school voucher act proposed in 1994 House Bill No. 2754 (H.B. 2754) is constitutional. You request the opinion in light of the recent decision of the United States Supreme Court in Zobrest v.Catalina Foothills School District, 509 U.S. ___, 125 L.Ed.2d 1,113 S.Ct. 2462 (1993).
Upon review of 1994 H.B. 2754, it appears that three major concepts are contained within the proposed legislation: a school voucher program; a school district assessment program; and a Kansas school voucher savings trust fund. Under the school voucher program, the parent of each program-eligible child may, upon application, receive from the state board of education a voucher which may be redeemed for payment of the costs of enrollment of the child at a Kansas nonpublic school selected by the parent. A Kansas nonpublic school is defined within the legislation as "any nonpublic school which (1) is located within the state of Kansas, and (2) is accredited by the state board or is a private elementary or secondary school." 1994 H.B. 2754, sec. 2. A private elementary or secondary school includes "an organization which regularly offers education at the elementary or secondary level and attendance at which satisfies the compulsory school attendance laws of this state, but which is not accredited by the state board of education," and which is registered with the state board. 1994 H.B. 2754, sec. 2; see K.S.A.72-53,100; 72-53,101. The state board is obligated to: prepare a list of all Kansas nonpublic schools participating in the school voucher program, accept applications for school vouchers, and certify to the director of accounts and reports the amount due the parent of each program-eligible child. 1994 H.B. 2754, secs. 5, 6. The director of accounts and reports is obligated to issue a warrant to the parent of a program-eligible child and ensure that the warrant is delivered to the school in which the child is enrolled. 1994 H.B. 2754, sec. 6.
In order for a program-eligible child to maintain such status, the child is obligated to participate in the school district assessment program conducted by the unified school district in which the child resides or in which the private elementary or secondary school is located. In conducting the assessment program, the board of education of the unified school district is to: determine the date, time, place, and method of participation and provide 15 days notice to the parent of the child; evaluate the results obtained from the assessment of the child; and report the assessment results to the child of the parent. If the child scores below the national median, on a composite basis, the school district is to consult with the parent and child in an effort to remedy any deficiencies. If the child continues in the next succeeding school year to score below the national median, and the school district determines that the child is not satisfactorily demonstrating academic improvement, the failure of the child is to be reported to the state board and the eligibility of the child to participate in the program at the school in which the child is enrolled and in attendance is to be forfeited. 1994 H.B. 2754, sec. 8.
Lastly, 1994 H.B. 2754 establishes the Kansas school voucher savings trust fund. Under the legislation, a voucher amount is equal to a designated percentage of the base state aid per pupil. 1994 H.B. 2754, sec. 2. Any portion of a voucher amount which exceeds the amount of tuition and fees charged by the nonpublic school in which the child is enrolled is to be remitted to the state treasurer for deposit in the fund, to be held in trust for the child for application toward tuition and fees charged for enrollment at an eligible postsecondary education institution. 1994 H.B. 2754, secs. 5, 9. Payments may be made on behalf of a trust fund beneficiary until the amount credited to the beneficiary's account is depleted or the beneficiary attains 26 years of age. As with the voucher program, the state board is obligated to certify to the director of accounts and reports the amount due the trust fund beneficiary, and the director is to issue a warrant and cause the warrant to be delivered to the eligible postsecondary education institution. 1994 H.B. 2754, sec. 9.
Because 1994 H.B. 2754 permits sectarian schools to participate in the programs and establishes various classifications, it is necessary to explore two issues under the constitutions of the United States and Kansas in order to determine the constitutionality of the bill: the establishment clauses of the United States and Kansas constitutions; and the equal protection clauses of the United States and Kansas constitutions.
 School Voucher Program
The establishment clause of the constitution of the United States, made applicable to the states through the fourteenth amendment, provides in part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const., Amend. I. As noted by the United States Supreme Court in Mueller v.Allen, 463 U.S. 388, 77 L.Ed.2d 721, 103 S.Ct. 3062 (1983):
 "[T]he Establishment Clause presents especially difficult questions of interpretation and application. It is easy enough to quote the few words constituting that Clause. . . . It is not at all easy, however, to apply this Court's various decisions construing the Clause to governmental programs of financial assistance to sectarian schools and the parents of children attending those schools. Indeed, in many of these decisions we have expressly or implicitly acknowledged that `we can only dimly perceive the lines of demarcation in this extraordinarily sensitive area of constitutional law.' [Citations omitted.]" Mueller, 463 U.S. at 392-93.
The first amendment's guarantee is more than a pledge that no single religion will be designated as a state religion. School District of Cityof Grand Rapids v. Ball, 473 U.S. 373, 381, 87 L.Ed.2d 267, 105 S.Ct. 3216
(1985). It is also more than a mere injunction that governmental programs discriminating among religions are unconstitutional. Id. The establishment clause instead primarily proscribes sponsorship, financial support, and active involvement of the sovereign in religious activity.Id. The United States Supreme Court implemented in Lemon v. Kurtzman,403 U.S. 602, 29 L.Ed.2d 745, 91 S.Ct. 2105 (1971), a three-pronged test to be applied in determining whether legislation comports with the establishment clause. Under the Lemon test: (1) the legislature must have adopted the law with a secular purpose; (2) the statute's principal or primary effect must be one that neither advances nor inhibits religion; and (3) the statute must not result in an excessive entanglement of government with religion. Lamb's Chapel v. CenterMoriches Union Free School District, 508 U.S. ___, 124 L.Ed.2d 352,113 S.Ct. 2141 (1993).
Subjecting 1994 H.B. 2754 to the Lemon test, we find that the school voucher program results in a violation of the establishment clause of thefirst amendment of the United States constitution. The purpose of the legislation is "to establish a statewide program under which the parents of eligible children are empowered to exercise choice in the selection of schools for enrollment and attendance of such children." 1994 H.B. 2754, sec. 1. The legislation affords the parents of eligible children the opportunity to exercise options regarding the education of their children. It does not appear that the "actual purpose" in creating the program is to endorse religion or that the secular purpose articulated in the legislation is merely "sham." See Witters v. Washington Dept. ofServices for the Blind, 474 U.S. 481, 496, 88 L.Ed.2d 846, 106 S.Ct. 748
(1986); Mueller, 463 U.S. at 394-95. The legislation proposed in 1994 H.B. 2754 would therefore withstand the first prong of the Lemon test.
It must then be determined whether the legislation's principal or primary effect is one that neither advances nor inhibits religion.
 "It is well settled that the Establishment Clause is not violated every time money previously in the possession of a State is conveyed to a religious institution. For example, a State may issue a paycheck to one of its employees, who may then donate all or part of that paycheck to a religious institution, all without constitutional barrier; and the State may do so even knowing that the employee so intends to dispose of his salary. It is equally well settled, on the other hand, that the State may not grant aid to a religious school, whether cash or in-kind, where the effect of the aid is `that of a direct subsidy to the religious school' from the State. Grand Rapids School District v. Ball, 473 U.S. at 394, 87 L.Ed.2d 267, 105 S.Ct. 3216. Aid may have that effect even though it takes the form of aid to students or parents. Ibid., see, e.g., Wolman v. Walter, 433 U.S. 229, 248-251, 53 L.Ed.2d 714, 97 S.Ct. 2593 (1977); Committee for Public Education Religious Liberty v. Nyquist, supra; Sloan v. Lemon, 413 U.S. 825, 37 L.Ed.2d 939, 93 S.Ct. 2982
(1973). The question presented is whether, on the facts as they appear in the record before us, extension of aid to petitioner and the use of that aid by petitioner to support his religious education is a permissible transfer similar to the hypothetical salary donation described above, or is an impermissible `direct subsidy.'" Witters, 474 U.S. at 486-87.
In Committee for Public Education v. Nyquist, 413 U.S. 756,37 L.Ed.2d 948, 93 S.Ct. 2955 (1973), the United States Supreme Court reviewed the constitutionality of a tuition reimbursement program established in New York. On the same day on which Nyquist was decided, the United States Supreme Court issued an opinion regarding the constitutionality of the Pennsylvania parent reimbursement act for nonpublic education. Sloan v. Lemon, 413 U.S. 825, 37 L.Ed.2d 939,93 S.Ct. 2982 (1973). In both cases, it was acknowledged that the reimbursements were paid to the parents of the pupils attending nonpublic schools. Nyquist, 413 U.S. at 780; Sloan, 413 U.S. at 828. The only major features which appeared to distinguish the two programs were that New York's program was available only to parents meeting certain financial need provisions and the reimbursements equalled a designated percentage of the tuition, Nyquist, 413 U.S. at 780, while the Pennsylvania program was available to all parents and was more generous than New York's. Sloan, 413 U.S. at 830-31. The Supreme Court distinguished Everson v. Board of Education, 330 U.S. 1, 91 L.Ed. 711,67 S.Ct. 504 (1947) (reimbursements to parents for bus transportation) and Board of Education v. Allen, 392 U.S. 236, 20 L.Ed.2d 1060,88 S.Ct. 1923 (1968) (direct loan of textbooks to pupils), noting that the two programs did not have a principal or primary effect of advancing or inhibiting religion. ("Most bus rides have no inherent religious significance. . . . [T]he language of [the textbook provisions] does not authorize the loan of religious books, and the State claims no right to distribute religious literature. . . ." Nyquist, 413 U.S. at 782.) In distinguishing Everson and Allen, the Supreme Court provided:
 "The tuition grants here are subject to no such restrictions. There has been no endeavor `to guarantee the separation between secular and religious educational functions and to ensure that State financial aid supports only the former.' Lemon v. Kurtzman, supra, at 613, 29 L.Ed.2d 745. Indeed, it is precisely the function of New York's law to provide assistance to private schools, the great majority of which are sectarian. By reimbursing parents for a portion of their tuition bill, the State seeks to relieve their financial burdens sufficiently to assure that they continue to have the option to send their children to religion-oriented schools. And while the other purposes for that aid — to perpetuate a pluralistic educational environment and to protect the fiscal integrity of overburdened public schools — are certainly unexceptionable, the effect of the aid is unmistakably to provide desired financial support for nonpublic, sectarian institutions." Nyquist, 413 U.S. at 783.
In Mueller, supra, the United States Supreme Court addressed a constitutional challenge to statutes of the state of Minnesota which allowed taxpayers, in computing their state income tax, to deduct certain expenses incurred in providing for the education of their children. In upholding the constitutionality of the statutes, the supreme court noted that the deduction available to the parents was one of many deductions available to taxpayers of the state and that the Supreme Court had consistently recognized that, traditionally, legislatures have especially broad latitude in creating classifications and distinctions in tax statutes. Mueller, 463 U.S. at 396. "More importantly, the deduction is available for educational expenses incurred by all parents, including those whose children attend public schools and those whose children attend nonsectarian private schools or sectarian private schools."Mueller, 463 U.S. at 397.
 "In this respect, as well as others, this case is vitally different from the scheme struck down in Nyquist. There, public assistance amounting to tuition grants, was provided only to parents of children in nonpublic schools. This fact had considerable bearing on our decision striking down the New York statute at issue; we explicitly distinguished both Allen and Everson on the grounds that `in both cases the class of beneficiaries included all
schoolchildren, those in public as well as those in private schools.' 413 U.S. at 782-83, n. 38, 37 L.Ed.2d 948, 93 S.Ct. 2955 (emphasis in original). Moreover, we intimated that `public assistance (e.g., scholarships) made available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefitted,' ibid., might not offend the Establishment Clause. We think the tax deduction adopted by Minnesota is more similar to this latter type of program than it is to the arrangement struck down in Nyquist. Unlike the assistance at issue in Nyquist, sec. 290.09, subd 22, permits all
parents — whether their children attend public school or private — to deduct their children's educational expenses. As Widmar and our other decisions indicate, a program, like sec. 290.09, subd 22, that neutrally provides state assistance to a broad spectrum of citizens is not readily subject to challenge under the Establishment Clause." Mueller, 463 U.S. at 398-99 (emphasis in original).
This analogy has been followed by the Supreme Court in Witters, supra, and Zobrest, supra. In Zobrest, the United States Supreme Court addressed whether the establishment clause barred a public school from providing a sign-language interpreter to accompany a deaf student to classes at a sectarian high school. Reviewing earlier decisions of the court in Mueller, supra, and Witters, supra, the court in Zobrest stated that "government programs that neutrally provide benefits to a broad class of citizens defined without reference to religion are not readily subject to an Establishment Clause challenge just because sectarian institutions may also receive an attenuated financial benefit." Zobrest,113 S.Ct. at 2466. The service at issue in Zobrest was part of a general government program that distributed benefits neutrally to any child qualifying as "handicapped" under the individuals with disabilities education act (IDEA), 20 U.S.C.S sec. 1400, et seq, without regard to the "sectarian-nonsectarian, or public-nonpublic nature" of the school the child attended. Because the IDEA created no financial incentive for the parents to chose a sectarian school, the presence of the government-paid interpreter was due solely to the private decision of the parents of the pupil.
 "When the government offers a neutral service on the premises of a sectarian school as part of a general program that `is in no way skewed towards religion,' Witters, supra, at 488, L.Ed.2d 846, 106 S.Ct. 748, it follows under our prior decisions that provision of that service does not offend the Establishment Clause." Zobrest, 113 S.Ct. at 2467, 125 L.Ed.2d at 11.
Upon review of the provisions of 1994 H.B. 2754, we find that the distinctions made in Mueller, Witters, and Zobrest are inapplicable. Unlike Mueller, Witters, and Zobrest, the benefits established under 1994 H.B. 2754 are available only to parents whose children attend nonpublic schools, the majority of which are sectarian. Kansas statutes permit pupils residing in one unified school district to attend public school in another unified school district. K.S.A. 72-1046; K.S.A. 1993 Supp.72-1046a; 72-6757; K.S.A. 72-8233. However, except for K.S.A. 1993 Supp. 72-1046a, such authority is subject to agreement of the sending unified school district and the receiving unified school district. Pursuant to K.S.A. 1993 Supp. 72-1046a, the board of education of a unified school district may permit pupils who are not residents of the school district to enroll in and attend the schools of the school district. "The board of education may permit such pupils to attend school without charge or . . . may charge such pupils for attendance at school to offset, totally or in part, the costs of providing for such attendance." K.S.A. 1993 Supp. 72-1046a. The school voucher program established in 1994 H.B. 2754 would not authorize the issuance of warrants to the parents of a nonresident pupil attending public school pursuant to K.S.A. 72-1046a. 1994 H.B. 2754 makes a distinction which was present in Nyquist, but not present in Mueller, Witters, and Zobrest. As was the situation in Nyquist, it is the function of 1994 H.B. 2754 to provide assistance to private schools, the great majority of which are sectarian. By reimbursing parents for a portion of their tuition bill, the state seeks to relieve their financial burdens sufficiently to assure that they continue to have the option to send their children to religion-oriented schools. However, the effect of the aid is unmistakably to provide desired financial support for nonpublic, sectarian institutions. 1994 H.B. 2754 fails the second prong of theLemon test, thereby resulting in a violation of the establishment clause of the United States constitution.
Many state constitutions prove to be far more restrictive than the establishment clause of the United States constitution regarding public support of sectarian institutions. 16A Am.Jur.2d Constitutional Law
sec. 477 (1979); see Witters, 474 U.S. at 491. A prime example of this is that the financial vocational assistance program which permitted payment of state funds to a visually handicapped student enabling him to attend a private sectarian college with the goal of becoming a pastor, minister, or church youth director was found by the United States Supreme Court to not result in a violation of the establishment clause of the United States constitution, Witters, supra; however, upon remand it was determined by the supreme court of the state of Washington to result in a violation of article 1, section 11 of the state constitution, which provides in part that "[n]o public money . . . shall be appropriated for or applied to any religious . . . instruction. . . ." Witters v. State Commission for theBlind, 771 F.2d 1119 (Wash. 1989), cert. denied, 493 U.S. 850,107 L.Ed.2d 106, 110 S.Ct. 147 (1989). Therefore, we believe it is appropriate to subject the school voucher program proposed in 1994 H.B. 2754 to review under the provisions of the Kansas constitution.
The bill of rights of the Kansas constitution provides in part:
 "The right to worship God according to the dictates of conscience shall never be infringed; nor shall any person be compelled to attend or support any form of worship. . . ." Kan. Const., Bill of Rights, sec. 7.
It is further provided in section 6 of article 6 of the Kansas constitution:
 "(c) No religious sect or sects shall control any part of the public educational funds."
While the Kansas constitution was modeled after the constitution for the state of Ohio, see Wyandotte Constitutional Convention 14-20 (1859), section 7 of the Kansas bill of rights may actually have been modeled after the constitution for the state of Indiana. Heller, The KansasState Constitution: A Reference Guide 52 (1993). Compare Ohio Const., art. 1, sec. 7; Ind. Const., Bill of Rights, secs. 2-6. Where a constitutional provision has actually been borrowed from another state after it has been construed by the court of last resort of that state, the general rule is that the construction is adopted with the provision. 16 Am.Jur.2d Constitutional Law sec. 122 (1979). However, it appears that neither the courts of Ohio nor Indiana provided such a construction prior to incorporation of the provision into section 7 of the bill of rights of the Kansas constitution. The courts of both states have since reviewed issues under the respective provisions but none of the cases has addressed whether a voucher system violates the provisions.
 "When our constitution became effective, January 29, 1861, there was no federal constitutional provision applicable to the new state respecting freedom of religious beliefs; hence, the framers of our constitution wrote into our bill of rights (section 7) . . . .
. . . .
 "It will be observed that the wording of this section of our bill of rights is much more in detail respecting religious freedom than is the first
amendment to the federal constitution.
 "Respecting our bill of rights, in Atchison Street Rly. Co. v. Mo. Pac. Rly. Co., 31 Kan. 660, 3 P. 284
[1884], it was held:
 "`The bill of rights is something more than a mere collection of glittering generalities; some of its sections are clear, precise and definite limitations on the powers of the legislature and all other officers and agencies of the state; and while others are largely in the nature of general affirmations of political truths, yet all are binding on legislatures and courts, and no act of the legislature can be upheld which conflicts with their provisions, or trenches upon the political truths which they affirm.' (Syl. para. 1.)" State v. Smith, 155 Kan. 588, 594-95
(1942).
Section 6 of article 6 of the Kansas constitution was included in a rewrite of article 6 which was adopted by the electors in 1966. However, a form of subsection (c) of section 6 has been included in the Kansas constitution since its original enactment. The particular provision originally stood on its own as section 8 of article 6.
Our research indicates that the provision of section 7 of the bill of rights regarding compelling a person "to attend or support any form of worship" and section 6 of article 6 have been the issue addressed in a minimal number of cases. Without specifically citing either constitutional provision, the Supreme Court of Kansas found in A.T. S.F. Rld. Co. v. City of Atchison, 47 Kan. 712 (1892) for a taxpayer in a challenge to a tax levy on personal property, the proceeds of which levy went to two private, sectarian educational institutions.
 "No argument is required to show the invalidity of the tax. Of course the public is interested in education, and taxes may be levied for the maintenance of public institutions of learning; but in this case the subscription and levy were for private and sectarian institutions. . . . [I]t is not contended that the colleges in question are under the supervision and control of the public, or that there is or could be any legislative authority to expend the public revenues for their support. The officers of the city had no power to impose a tax on the property of the citizens of Atchison to aid private, sectarian schools, or to promote private interests and enterprises." A.T. S.F. Rld. Co., 47 Kan. at 714 (emphasis added).
In Billard v. Board of Education, 69 Kan. 53 (1904), the Supreme Court reviewed whether the Lord's Prayer and the 23rd Psalm could be recited in a public school. Addressing an argument that such recitation resulted in a violation of section 7 of the bill of rights, the Supreme Court stated:
 "Both our constitution and statutes prohibit all form of religious worship or the teaching of sectarian or religious doctrine in the public schools. Section 7 of the bill of rights contains the following provision: `Nor shall any person be compelled to attend or support any form of worship.' That is, no person shall be compelled to pay tithes or taxes to secure or maintain a place where any form of religious worship shall be conducted, or where any religious doctrine is taught; nor shall any form of religious worship be conducted, or any sectarian or religious doctrine be taught, in any place supported by imposition of taxes." Billard, 69 Kan. at 56 (emphasis added).
The court determined that based on the evidence before it "the exercises . . . were not a form of religious worship or the teaching of sectarian or religious doctrine." Billard, 69 Kan. at 58. Therefore, a violation of section 7 of the bill of rights had not occurred.
In Wright v. School District, 151 Kan. 485 (1940), the Supreme Court of Kansas determined that section 7 does not prevent a taxpayer from seeking an injunction against the use of tax funds for a sectarian school. In reversing the lower court, the Supreme Court stated:
 "Under our constitution (Bill of Rights, sec. 7, art. 6, sec. 8 [presently sec. 6]), our statutes and our decisions (A., T. S.F. Rld. Co. v. City of Atchison, 47 Kan. 712, 28 P. 1000; Billard v. Board of Education, 69 Kan. 53, 56, 76 P. 422), it is clear that no religious sect, or sects, can lawfully control our school funds, nor can sectarian doctrines be taught lawfully in our public schools.
. . . .
 "Indeed, under our constitutional provisions, we would be slow to say the action could not be maintained by taxpayers to enjoin the use of tax funds to teach sectarian doctrines in our schools, even though there was no question about the regularity or legality of the establishment of the school." Wright, 151 Kan. at 486-87.
The Kansas Court of Appeals found a violation of the provision of section 7 of the bill of rights in State v. Evans, 14 Kan. App. 2d 591
(1990). The Court of Appeals determined that a condition of probation requiring continued association with a particular religious entity was invalid as violative of the Kansas constitution. Evans,14 Kan. App. 2d at 591, Syl. para. 2. "The Kansas Constitution contains a strong prohibition against religious coercion." Evans,14 Kan. App. 2d at 593.
A number of cases have addressed other specific provisions of section 7 or recited section 7 in its entirety. For the most part though, these cases appear to cite section 7 in passing and generally rely on the federal constitutional provision in reaching a determination. See Statev. Barclay, 238 Kan. 148 (1985); State ex rel. Pringle v. HeritageBaptist Temple, Inc., 236 Kan. 544 (1985); State v. Garber, 197 Kan. 567
(1966); Wright v. Raines, 1 Kan. App. 2d 494 (1977).
Following the interpretations set forth by the Kansas appellate courts, we determine that section 7 of the bill of rights of the Kansas constitution clearly provides that no person may be compelled to pay tithes or taxes to secure or maintain a place where any form of religious worship is to be conducted, or where any religious doctrine is to be taught. Subsection (c) of section 6 of article 6 precludes any religious sect from controlling any part of the public educational funds. The courts have long recognized that sectarian schools pursue two goals, religious instruction and secular education. Allen, 392 U.S. 236, 245,20 L.Ed.2d 1060, 88 S.Ct. 1923 (1968); Meek v. Pittenger, 421 U.S. 349,366, 44 L.Ed.2d 217, 95 S.Ct. 1753 (1975). "Substantial aid to the educational function of such schools, accordingly, necessarily results in aid to the sectarian school enterprise as a whole. `[T]he secular education those schools provide goes hand in hand with the religious mission that is the only reason for the schools' existence. Within the institution, the two are inextricably intertwined.' [Lemon, 403 U.S.] at 657, 91 S.Ct. at 2133 (opinion of Brennan, J.)." Meek, 421 U.S. at 366.See also, Zobrest, 125 L.Ed.2d at 7, fn. 1, 113 S.Ct. at 2464, fn. 1. Therefore, if the state confers money upon a sectarian school, the result is, unavoidably, state support of a form of worship. The state has no power to impose a tax on the citizens of Kansas to aid sectarian schools.See A.T. S.F. Railroad Co., 47 Kan. at 714. While the director of accounts and reports is obligated pursuant to the provisions of 1994 H.B. 2754 to issue a warrant to the parent of a program-eligible child, the director remains obligated to ensure that the warrant is delivered to the school in which the child is enrolled. The parent serves merely as a conduit through whom the state aid passes. As 1994 H.B. 2754 results in the conferring of state funds upon a place where a form of religious worship is to be conducted, or where religious doctrine is to be taught, the school voucher program established in 1994 H.B. 2754 violates section7 of the bill of rights of the Kansas constitution.
 School District Assessment Program
In Committee for Public Education and Religious Liberty v. Regan,444 U.S. 646, 63 L.Ed.2d 94, 100 S.Ct. 840 (1980), and Wolman v. Walter,433 U.S. 229, 53 L.Ed.2d 714, 97 S.Ct. 2593 (1977), the United States Supreme Court upheld, respectively, acts of the state of New York and of the state of Ohio which provided for the academic testing at public expense of pupils of private schools, including sectarian schools. In both cases, the tests were prepared by the states and administered on the premises by nonpublic school personnel. Regan, 444 U.S. at 656. The Ohio tests were graded by the state. Two of the three tests involved in the New York plan were graded by nonpublic school personnel; however, the tests were of an objective nature and were reviewed off school premises by the state department of education. The nonpublic schools had no control over the contents of the tests or the results of the tests.Regan, 444 U.S. at 656. "The State may require that schools that are utilized to fulfill the State's compulsory-education requirement meet certain standards of instruction, and may examine both teachers and pupils to ensure that the State's legitimate interest is being fulfilled. [Citations omitted.]" Wolman, 433 U.S. at 240; see Regan,444 U.S. at 653-54. In those instances in which the nonpublic schools control neither the content nor the results of the tests, the nonpublic schools are unable to utilize the tests as a part of religious teaching, and thus direct aid to religion is avoided. Similarly, the inability of the nonpublic schools to control the tests eliminates the need for supervision that gives rise to excessive entanglement. Wolman,433 U.S. at 240; Regan, 444 U.S. at 656.
Pursuant to the provisions of 1994 H.B. 2754, the board of education of a unified school district is responsible for establishing the date, time, place, and method of participation of the nonpublic school pupil in the assessments, and for evaluating the results obtained from the assessments. We do not have information regarding the form of participation of the pupils in the assessments. Nor do we know whether the evaluations of results conducted by the unified school districts precludes any sort of role by the nonpublic schools. However, on the face of the proposed legislation, it appears nonpublic schools exercise no role in the assessment procedure, nor are the nonpublic schools able to exercise any type of control over the results of the assessments. Therefore, there may be instances in which provisions of the legislation may be applied in an unconstitutional manner. However, following the precedents set forth in Regan, supra, and Wolman, supra, we find that the provisions regarding the school district assessment program are not facially unconstitutional. The school district assessment program is established with a secular purpose, does not have the principal or primary effect of advancing or inhibiting religion, and does not foster an excessive entanglement with religion. As set forth, the school district assessment program does not result in a violation of the establishment clause of the first amendment of the United States constitution.
Likewise, the school district assessment program established in 1994 H.B. 2754 would not violate provisions of the Kansas constitution. As noted above, the board of education of a unified school district is responsible for establishing the date, time, place, and method of participation of the nonpublic school pupil in the assessments, and for evaluating the results obtained from the assessments. While it appears the costs of the assessments would be absorbed by the state, no state funds would be conferred upon either the nonpublic school or the pupil of such nonpublic school. No person would be compelled to pay tithes or taxes to secure or maintain a place where any form of religious worship is to be conducted, or where any religious doctrine is to be taught. The public funds would be expended in an attempt to ensure that a pupil is receiving the appropriate education, a valid state interest. As the public funds are never conferred upon the nonpublic school, no religious sect is able to control any of the public educational funds. The school district assessment program established in 1994 H.B. 2754 does not violate section 7 of the bill of rights or section 6 of article 6 of the Kansas constitution.
 School Voucher Savings Trust Fund
The Kansas school voucher savings trust fund authorizes payments to be made on behalf of postsecondary education trust fund beneficiaries to eligible postsecondary education institutions. Eligible postsecondary education institutions are those institutions of postsecondary education which: (1) qualify as eligible institutions for federal student aid programs under title IV of the higher education act of 1965, as amended; and (2) have the main campus or place of operation located in Kansas. 1994 H.B. 2754, sec. 2. As was the situation in Zobrest, supra, the payments from the school voucher savings trust fund are made without regard to the "sectarian-nonsectarian, or public-nonpublic nature" of the postsecondary education institution the student attends. The school voucher savings trust fund, in and of itself, does not create a financial incentive to chose a sectarian postsecondary education institution. However, in order to qualify as a beneficiary of the trust fund, one must have been a program-eligible child and participated in the school voucher program. 1994 H.B. 2754, secs. 1, 8.
The United States constitution, Amend. 14, sec. 1, states:
 "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."
Sections 1 and 2 of the Kansas bill of rights are a counterpart to the equal protection clause of the United States constitution. Leiker v.Gafford, 245 Kan. 325, 362 (1989); see Sharples v. Roberts, 249 Kan. 286,289 (1991). These sections provide:
 "sec. 1. Equal rights. All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness.
 "sec. 2. Political power; privileges. All political power is inherent in the people, and all free governments are founded on their authority, and are instituted for their equal protection and benefit. No special privileges or immunities shall ever be granted by the legislature, which may not be altered, revoked or repealed by the same body; and this power shall be exercised by no other tribunal or agency." Kan. Const., Bill of Rights, secs. 1, 2.
Equal protection arguments under the Kansas constitution and the United States constitution are generally based upon allegations that a particular statutory classification denies to the person or parties falling within the classification some right which is not denied to others alleged to be similarly situated. Bair v. Peck, 248 Kan. 824, 830
(1991). The protections afforded by sections 1 and 2 being duplicative of those provided by the fourteenth amendment, the test for constitutional transgression should also be identical; if a law does not violate the fourteenth amendment of the United States constitution, neither does it violate sections 1 and 2 of the bill of rights of the Kansas constitution. Leiker v. Employment Security Board of Review,8 Kan. App. 2d 379, 387 (1983).
Equal protection analysis must begin with a determination of the applicable level of judicial scrutiny to be applied in analyzing the statute in question. Bair v. Peck, 248 Kan. at 830; Guardian Title Co.v. Bell, 248 Kan. 146, 155 (1991). Strict scrutiny review — the most exacting standard of review under the equal protection clause — is reserved for statutes or state constitutional amendments that discriminate against members of traditionally suspect classes, see, e.g.,Graham v. Richardson, 403 U.S. 365, 372, 29 L.Ed.2d 534, 91 S.Ct. 1848
(1971) (alienage); Loving v. Virginia, 388 U.S. 1, 11, 18 L.Ed.2d 1010,87 S.Ct. 1817 (1967) (race); Korematsu v. United States, 323 U.S. 214, 216,89 L.Ed. 194, 65 S.Ct. 193 (1944) (national ancestry and ethnic origin), or infringe on any fundamental constitutional right, City of Cleburne v.Cleburne Living Center, Inc., 473 U.S. 432, 440, 87 L.Ed.2d 313,105 S.Ct. 3249 (1985). Laws that are subject to strict scrutiny review will be sustained only if they are supported by a compelling state interest and are narrowly drawn to achieve that interest in the least restrictive manner possible. Plyler v. Doe, 457 U.S. 202, 217,72 L.Ed.2d 786, 102 S.Ct. 2382 (1982).
Intermediate review, which requires a showing that the law in question is substantially related to a sufficiently important governmental interest, Mississippi University for Women v. Hogan, 458 U.S. 718, 724,73 L.Ed.2d 1090, 102 S.Ct. 3331 (1982), has been applied in the context of laws which draw distinctions based on gender, Mississippi Universityfor Women, 458 U.S. at 723-24, and illegitimacy, Lalli v. Lalli,439 U.S. 259, 265, 58 L.Ed.2d 503, 99 S.Ct. 518 (1978), but not to those laws which create differential treatment based on age, MassachusettsBoard of Retirement v. Murgia, 427 U.S. 307, 313, 49 L.Ed.2d 520,96 S.Ct. 2562 (1976).
In those instances in which no suspect classification or quasi-suspect classification has been set forth and no fundamental rights are at issue, the least strict level of scrutiny is appropriate. Guardian TitleCo., 248 Kan. at 155. Traditionally, the yardstick for measuring equal protection arguments has been the reasonable basis test. Bair,248 Kan. at 831. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the state's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it. McGowan v. Maryland, 366 U.S. 420, 425-26, 6 L.Ed.2d 393,81 S.Ct. 1101 (1961); Guardian Title Co., 248 Kan. at 155.
The school voucher savings trust fund established in 1994 H.B. 2754, sec. 8 neither discriminates against members of traditionally suspect or quasi-suspect classes, nor infringes on any fundamental constitutional right. The classification is therefore subject to the lowest level of scrutiny under equal protection, and the provision will be upheld if any state of facts reasonably may be conceived to justify it. The stated purpose of 1994 H.B. 2754 is "to establish a statewide program under which the parents of program-eligible children are empowered to exercise choice in the selection of schools for enrollment and attendance of such children." 1994 H.B. 2754, sec. 1. Due to provisions of the school voucher program, the school voucher savings trust fund is unavailable to pupils attending public schools. The purpose behind 1994 H.B. 2754 is to empower parents of program-eligible children with the opportunity to exercise choice in the selection of schools for enrollment and attendance of program-eligible children. A program-eligible child is in part "any person who is . . . (2) school age and eligible for enrollment in school and attendance at kindergarten or any of the grades one through 12 . . .," 1994 H.B. 2754, sec. 2. It is difficult to perceive how financial assistance available at the postsecondary level serves a rational basis and is relevant to the achievement of the state's objective of empowering parents to make selections regarding the enrollment and attendance of pupils attending kindergarten or any grade 1 through 12. In its present form, the Kansas school voucher savings trust fund would result in a violation of equal protection under both the constitutions of the United States and Kansas. However, as 1994 H.B. 2754 continues to be debated by the Kansas legislature, a rational basis for the Kansas school voucher savings trust fund may be established.
Very truly yours,
 ROBERT T. STEPHAN Attorney General of Kansas
 Richard D. Smith Assistant Attorney General
RTS:JLM:RDS: